682 P.2d 607

**Carmen Estelle SUCHAN,
Plaintiff-Respondent,**

v.

**George A. SUCHAN,
Defendant-Appellant.**

**No. 14890.**

Supreme Court of Idaho.

May 15, 1984.

Roger D. Ling, of Ling, Nielsen & Robinson, Rupert, for defendant-appellant.

Richard K. Smith, of Parsons, Smith, Stone & Fletcher, Burley, for plaintiff-respondent.

DONALDSON, Chief Justice.

This case presents to us questions regarding the character of various property incident to a property division in a divorce proceeding. In particular, we will deal with the issue of transmutation and will examine an agreement entered into by the parties on June 30, 1972.

The salient facts are undisputed by the parties. Carmen and George Suchan were married on June 10, 1954. Throughout the marriage, George was engaged in the business of farming. In 1950, four years prior to the parties' marriage, George's parents purchased on contract both the West Half and the East Half of Section 16, Township 8 South, Range 22 East of the Boise Meridian. The contract for the West Half was in George's name. The contract for the East Half was in the name of George's father. George's parents made the down payment on each half and made the annual payments on each contract through 1958. Beginning in 1959, George and Carmen made the annual payments on both pieces of property out of community funds.

George and Carmen made the balance of the payments on the West Half, except for the 1969 annual payment. George and Carmen completed paying off the West Half in 1972, and a deed was issued in the name of George Suchan. The West Half was then mortgaged, and the funds were used to purchase and install a well and irrigation system on the parcel. As a result, the land was converted from desert land into productive farm land.

From 1959 through 1978, George and Carmen also made all the annual payments on the East Half, except for the 1972 annual payment. In 1971, George's parents assigned the East Half contract to George. Subsequently, in 1978, a deed was issued in the name of George Suchan to the East Half. The well and irrigation system installed on the West Half was also used to convert the East Half from unimproved desert land to productive farm land.

For several years prior to the divorce, the parties lived in a home located on three acres of property which was owned by George's parents. The parties remodeled the home and, in addition, purchased and installed two grain bins, a shop building, and a hog feeding facility on the property. In 1977, George inherited a one-half undivided interest in this property from his father. In 1980, George's mother quitclaimed her one-half interest in this property to George.

On October 28, 1980, Carmen Suchan filed for divorce. After a trial on the matter, the magistrate issued his Findings of Fact and Conclusions of Law, and concluded that the parties were entitled to a divorce on the grounds of irreconcilable differences. In addition, the magistrate concluded that the three acres together with the parties' home was George's separate property, but was subject to the community's right of reimbursement in the sum of $60,000 for improvements made on the property by the community, and that the remainder of the real property, including the West and East Halves of Section 16, was community property. Finally, the magistrate disregarded two obligations which George contended were community debts.

George appealed the magistrate's decision to the district court. The district court filed both a Memorandum Opinion and a Supplemental Memorandum Opinion, and

affirmed the magistrate's decision. This appeal followed.

We will first address the characterization of the West and East Halves of Section 16. We will then address the community's right to reimbursement for expenditures made on the three-acre parcel.

### I.

The trial court based its conclusion that the West and East Halves of Section 16 were community property on two separate theories: (1) that the West and East Halves have been community property from the time that they were acquired; (2) that even if the West and East Halves were separate property at the time they were acquired, they were transmuted to community property by agreement of the parties on June 30, 1972. On appeal, the district court was hesitant to adopt the trial court's first theory, and therefore, expressed no opinion on it. However, the district court affirmed the trial court on the second theory.

■ In determining the character of the West and East Halves of Section 16, we are guided by two fundamental principles of our community property law. First, it is axiomatic that all property acquired by either spouse during the marriage is rebuttably presumed to be community property. *Stanger v. Stanger*, 98 Idaho 725, 571 P.2d 1126 (1977); *Guy v. Guy*, 98 Idaho 205, 560 P.2d 876 (1977). Second, I.C. § 32–903 provides that all property acquired by either spouse prior to the marriage, or thereafter acquired by gift, bequest, devise or descent, constitutes separate property.

■ Applying these two rules of law to the facts in this case, we conclude that both the West and East Halves of Section 16 were George's separate property from the time they were acquired. In particular, in characterizing the West Half, we are presented with a factual situation almost identical to the one presented to us in *Fisher v. Fisher*, 86 Idaho 131, 383 P.2d 840 (1963). In *Fisher*, we quoted approvingly a portion of American Jurisprudence which states that "property to which one spouse has acquired an equitable right before marriage is separate property, though such right is not perfected until after marriage." *Fisher, supra* at 136, 383 P.2d at 842 (quoting 11 Am.Jur. *Community Property* § 20, p. 187). Since the contract on the West Half was in George's name and was entered into four years prior to the parties' marriage, George acquired an equitable interest in this property prior to marriage. Therefore, in accordance with our holding in *Fisher*, the West Half was George's separate property from the time it was acquired.

■ As to the East Half of Section 16, the trial court found that the contract was in the name of George's father. Furthermore, the trial court found that this contract was assigned to George in December of 1971. The only evidence introduced regarding this assignment was the testimony of George's mother wherein she stated that the assignment was a "gift to George." Thus, according to the evidence, the contract for the East Half was received by George during the marriage by gift. Applying I.C. § 32–903, the contract on the East Half would be George's separate property. Therefore, we hold that the East Half of Section 16 was George's separate property at the time it was acquired.

Having determined that the West and East Halves of Section 16 were George's separate property, we will now examine what effect, if any, the June 30, 1972 agreement had on the character of the property. The agreement entered into by the parties reads as follows:

"AGREEMENT AS TO STATUS OF COMMUNITY PROPERTY

"After Death Of One Of The Spouses

"This Agreement, made and entered into this 30th day of June, 1972, by and between George A. Suchan and Carmen Suchan, husband and wife, of Rupert, Minidoka County, State of Idaho.

"WITNESSETH: That whereas the said parties hereto are owners of certain community real property below described and are desirous that said real property,

together with the following described community personal property, now owned, and all other community personal property that may hereafter be acquired, shall pass without delay and expense, upon the death of either, to the survivor.

"REAL PROPERTY

"Said Real property is situated in the county of Minidoka State of Idaho, and is described as follows:

"The West Half and the East Half of Section Sixteen (16), also the Southeast ¼ of Section Seventeen, both in Township Eight (8) South, Range Twenty-two (22) East Boise Meridian, Minidoka County, Idaho.

"PERSONAL PROPERTY

"Checking Accounts, Savings Accounts, Stocks and Bonds, Automobiles, Household goods and any and all other miscellaneous goods of whatsoever kind or description.

"NOW THEREFORE, for and in consideration of the sum of One ($1.00) Dollar in hand paid, and other valuable consideration, the receipt of which is hereby acknowledged by each party hereto, and also, in consideration of the love and affection that each of said parties bears for the other, and the mutual benefits to be derived by the parties hereto, it is hereby agreed, covenanted, and promised:

"I.

"That the said described real property with all appurtenances and fixtures

thereto, and the said described personal property, now owned, and all community personal property that may hereafter be acquired, shall be considered and is hereby declared to be community property and to the extent necessary we do hereby transfer, grant and convey the described property to each other as community property.

"II.

"That on the event of the death of either of the aforementioned parties, while the other party survives, the whole of said community property as herein defined and described shall immediately vest in the surviving party in fee simple.

" /s/ George A. Suchan
" /s/ Carmen Suchan"

After the parties executed the agreement, it was recorded in Minidoka County on June 30, 1972.

George Suchan admits the execution and recording of the agreement, but argues that the parties entered into the agreement pursuant to I.C. § 32–921 *repealed by* 1971 Idaho Sess.Laws ch. 11, p. 233 (repeal effective July 1, 1972), and that the parties intended the agreement to take effect only upon the death of one of the spouses. Carmen Suchan, on the other hand, argues that only the portion of the agreement dealing with disposition of the community property upon death of one of the spouses was to take effect upon death, and that the paragraph identified as "I" of the agreement was to take effect immediately.

We begin our analysis by analyzing I.C. § 32–921.[1] Essentially, I.C. § 32–921 au-

1. I.C. § 32–921 read as follows:

"**32–921. AGREEMENT AS TO PROPERTY.**—Nothing contained in any provisions of this chapter or in any law of this state, shall prevent the husband and wife from jointly entering into any agreement concerning the status or disposition of the whole or any portion of the community property, then owned by them or afterwards to be acquired, to take effect upon the death of either; provided, however, that a legal description of any real property to be affected by the agreement must be included therein. But such agreement

may be made at any time by the husband and wife by the execution of an instrument in writing, and executed and acknowledged or proved in the same manner as deeds to real property are required to be, under the laws of the state, and the same may at any time thereafter be altered or amended in the same manner: provided, however, that such agreement shall not derogate from the right of creditors, and any debt, chose in action, cause of action, or other legal obligation which could have been presented as a claim against the community property of a deceased spouse's estate

thorized agreements entered into between husbands and wives "concerning the status or disposition ... of the community property, ... to take effect upon the death of either." Apparently, the legislature intended to provide married individuals with an opportunity to dispose of property upon death while at the same time avoiding probate. We have never before had an occasion to interpret I.C. § 32–921. However, we are aware that the state of Washington has a statute which is very similar.[2] Therefore, we will examine the Washington courts' analysis of their statute and agreements entered into thereunder as persuasive authority.

After reviewing Washington case law, we find that *Merriman v. Curl*, 8 Wash. App. 894, 509 P.2d 765 (1973), is most enlightening. In *Merriman* the court concluded that spouses, via a community property agreement, may: (1) affect the status of their property at the time of the execution of the agreement; (2) affect the status of their property at death; and, (3) dispose of the property upon the death of one of

the spouses. Prior to arriving at this conclusion, the *Merriman* court noted:

"A property agreement determining the immediate status of personal property between a husband and wife is a non-statutory creature. RCW 26.16.050 provides for conveyances of real property between spouses, and RCW 26.12.120 provides a method of disposing of community property to take effect upon the death of one of the spouses, but there. are no statutes providing for the immediate disposition of property by agreement of the spouses."

*Merriman, supra,* at 769 (quoting 33 Wash.L.Rev. 112 (1958)).

In addition to reviewing Washington case law, we have also examined the language of I.C. § 32–921. It is clear that the phrase "to take effect upon the death of either" modifies the word "agreement." Therefore, relying on the language of I.C. § 32–921 and the persuasive authority of Washington case law, we conclude that I.C. § 32–921 only authorized agreements wherein the transmutation of property takes effect upon the death of one of the

---

shall survive against the surviving spouse. Statutes of limitations on any debt, chose in action, cause of action, or other legal obligation against the community property of the husband and wife shall continue to run, as though the deceased spouse had survived. Any action brought against the surviving spouse to recover a judgment on any such obligation shall be commenced within the time limited for commencement of such action against the deceased spouse, if he had survived.

"Before any agreement entered into hereunder shall be effective, the agreement, and any amendments thereto, shall, prior to the death of either spouse, be recorded in the recorder's office of each county in which there is real property described in the agreement or amendments.

"Divorce of the parties entered into an agreement hereunder shall revoke the agreement.

"Nothing contained herein shall prevent the surviving spouse to such an agreement from electing to disregard the right of survivorship contained in the agreement and having the decedent's estate administered under the laws of Idaho.

"Upon the death of either of the spouses who have entered into an agreement under

this section, a certificate of death for such spouse must be recorded in the recorder's office of each county in which the agreement is recorded."

2. Wash.Rev.Code § 26.16.120 reads as follows: "26.16.120 **Agreements as to status.** Nothing contained in any of the provisions of this chapter or in any law of this state, shall prevent the husband and wife from jointly entering into any agreement concerning the status or disposition of the whole or any portion of the community property, then owned by them or afterwards to be acquired, to take effect upon the death of either. But such agreement may be made at any time by the husband and wife by the execution of an instrument in writing under their hands and seals, and to be witnessed, acknowledged and certified in the same manner as deeds to real estate are required to be, under the laws of the state, and the same may at any time thereafter be altered or amended in the same manner: *Provided, however,* That such agreement shall not derogate from the right of creditors, nor be construed to curtail the powers of the superior court to set aside or cancel such agreement for fraud or under some other recognized head of equity jurisdiction, at the suit of either party."

spouses. However, we hasten to add that our analysis does not end here.

■ Although there is no Idaho case law authorizing agreements which transmute property at the time of the execution of the agreement as there is in Washington, I.C. § 32–916 does provide such authorization. Recently, our Court of Appeals, after analyzing I.C. §§ 32–916 through 32–919, concluded that a "husband and wife may elect at any time to change their property rights." *Stockdale v. Stockdale*, 102 Idaho 870, 873, 643 P.2d 82, 85 (Ct.App.1982). Although the specific issue in *Stockdale* was whether or not oral transmutation is recognized in Idaho, we believe that the Court of Appeals' conclusion that I.C. § 32–916 authorizes transmutation which may take place at any time is correct.[3]

■ Having determined that there is authority in Idaho for both types of agreements (*i.e.*, agreements transmuting property at the time of the execution of the agreement, and agreements transmuting property at the death of one of the spouses), we now look to the agreement signed by the parties to determine when they intended the transmutation to take place. The intent of the parties herein should, if possible, be ascertained from the language contained in their contract, and unless it contains absurdities or contradictions, the contract is the best evidence of the parties' intent. *See Farm Development Corp. v. Hernandez*, 93 Idaho 918, 478 P.2d 298 (1970); *Boesiger v. DeModena*, 88 Idaho 337, 399 P.2d 635 (1965); *Minidoka County v. Krieger*, 88 Idaho 395, 399 P.2d 962 (1964). Furthermore, where a contract is clear and unambiguous, determination of its meaning and legal effect are questions of law to be decided by the court. *International Engineering Co., v. Daum Industries, Inc.*, 102 Idaho 363, 630 P.2d 155

(1981); *Parks v. City of Pocatello*, 91 Idaho 241, 419 P.2d 683 (1966).

■ After examining the contract as a whole, we conclude that it was the intention of the parties herein that the separate property described in the agreement was to be transmuted to community property immediately upon the execution of the agreement. In particular, we note that the second paragraph of the agreement refers to "certain community real property below described." Also, the language of the paragraph identified as "I" is clear and unequivocal in stating: "That the said described real property ... shall be considered and is *hereby* declared to be community property and to the extent necessary we do *hereby* transfer, grant and convey the described property to each other as community property." (Emphasis added.) This language clearly reflects the parties' intention to transmute the property immediately. Had the parties intended the transmutation to take place only upon the death of one of them, it would have been relatively easy to use conditional language rather than the language of immediate transfer which was used.

George Suchan argues that the contract was specifically entered into pursuant to I.C. § 32–921, and that the subtitle of the agreement which reads "After Death Of One Of The Spouses" indicates that the parties intended the transmutation to take place only upon the death of one of the spouses. We are unpersuaded by both arguments. Nowhere in the agreement is there reference made to I.C. § 32–921. Moreover, the subtitle referred to appears to us to relate to the disposition of the community property provided for in the paragraph identified as "II," rather than the transmutation of property provided for in the paragraph identified as "I." There-

---

**3.** Six of our seven community property sister states recognize agreements wherein spouses may transmute separate property to community property. *See Moser v. Moser,* 117 Ariz. 312, 572 P.2d 446 (1977); Cal.Civ.Code § 5133 (West 1983); La.Civ.Code Ann. art. 2328 (West 1971); Nev.Rev.Stat. § 123.010 (1979); N.M.Stat.Ann. §§ 40–2–2, –4 (1983); *Merriman v. Curl,* 8 Wash.App. 894, 509 P.2d 765 (1973). Texas is the only community property state that does not allow an agreement transmuting separate property to community property. McKnight, *The Constitutional Redefinition of Texas Matrimonial Property as it Affects Antenuptial and Interspousal Agreements,* 13 St. Mary's L.J. 449 (1982).

fore, we hold that at the time of the execution of the agreement on June 30, 1972, both the West Half and the East Half of Section 16 were transmuted from separate property into community property.

## II.

The next issue we will address concerns the conclusion of the lower courts that the community is entitled to $60,000.00 as a right of reimbursement for improvements made by the community on the three-acre parcel of land. As stated previously, all of the improvements made by the community to the three-acre parcel were made when the property was owned by George's parents. Consequently, George argues on appeal that the community is not entitled to any reimbursement since none of the improvements were made after he received his separate interest in the property.

 When separate property is enhanced by community efforts, labor, industry, or funds, the community is entitled to reimbursement for such enhancement. *Suter v. Suter,* 97 Idaho 461, 546 P.2d 1169 (1976); *Hiatt v. Hiatt,* 94 Idaho 367, 487 P.2d 1121 (1971); *Tilton v. Tilton,* 85 Idaho 245, 378 P.2d 191 (1963). Clearly, the facts of this case take it outside the direct application of this rule. When the improvements were made here, the property was not the separate property of George, but was the property of George's parents. It was only after all of the improvements were made that George obtained title to this property as his separate property. However, as the district court noted, the record indicates that the parties were living on the property with the consent of the parents. Furthermore, it appears that there was a tacit agreement that George would eventually acquire the property. Therefore, under the particular facts of this case, we affirm the magistrate court's exercise of its equitable powers, *Rudd v. Rudd,* 105 Idaho 112, 666 P.2d 639 (1983) (actions for divorce are actions in equity), in holding that the community is entitled to reimbursement for the improvements made to the three-acre parcel.

## III.

 We have considered the remaining assignments of error and, after examining the record, we find no error. In addition, respondent Carmen Suchan requests attorney fees on appeal. However, many of the issues presented herein are matters of first impression and we do not believe the appeal was brought unreasonably or without foundation. Therefore, we deny respondent's request for attorney fees.

Judgment of the district court affirmed.

Costs to respondent.

No attorney fees on appeal.

SHEPARD and HUNTLEY, JJ., concur.

SHEPARD, Justice, specially concurring.

I concur with the majority opinion, but in part for reasons beyond those enunciated by the majority. In my view, not only does the execution of the agreement by the parties bear on the question of transmutation, but also other actions of the parties can be construed to reach the same effect. Here, although the legal ownership of the farm property was for some time in the name of the parents of the defendant-husband, as indicated by the majority opinion, the parties invested very substantial moneys and labor in that property and, in my opinion, treated it and considered it as community property. Hence, the fact that the ultimate legal title was placed in the name of the defendant is immaterial and the earlier actions of the parties would result in an effective transmutation into the status of community property.

As to part III of the majority opinion dealing with attorney's fees on appeal, I point out further that, rather clearly, each party obtained very substantial property as a result of the divorce and each is clearly able to bear his or her own attorney's fees.

BISTLINE, Justice, concurring in part and concurring in the judgment.

Agreeing with the Court's disposition of the transmutation doctrine, I agree with

the district court that there was no reason to determine whether the two half-sections were or were not acquired as separate property of the husband. Seeing that much of our opinion as dictum, I nevertheless tend to agree that the Chief Justice's conclusion is probably the correct one.

There is an inescapable inference to be drawn from the fact that the Community Property Agreement was executed and recorded on the very last day before the repealer took effect. For that reason I cannot believe our opinion is sound in not being persuaded by the husband's argument that the "Agreement" was entered into in order to obtain the benefits of I.C. § 32–921 while it still had life. But I do not see that error as fatal to a decision which provides a result consonant with the *unambiguous* language of the Agreement, and also a result compatible with the fact that the parties at that time were not incompatible.

Going beyond declaring the status of the property, the document in question *clearly* evidences an intent on the part of *both parties* to create a community estate at that time. To my mind it is of no concern that there was neither legislative enactment nor prior Idaho Supreme Court precedent "authorizing" a transmutation of property. The Court of Appeals opinion in *Stockdale v. Stockdale* leaves me totally perplexed, and I do not presently embrace the views therein set forth, other than the statement at p. 873 of 102 Idaho, at p. 85 of 643 P.2d declaring that "certain formalities" are required. Those formalities are, presently at least, a written instrument which is signed by the party to be charged and described the property with certainty. In this case the property is so described, and the document is signed by the husband and by the wife. And, those signatures were acknowledged on the 30th day of June, 1972.

With all due respect to the Court of Appeals and the majority of this Court, there has never been in Idaho any restraint on a husband's right to transfer and convey to his wife his interest in real property, whether it be thought to be separate, or thought to be community. Such transfers have been made forever. Moreover, I would doubt the constitutionality of any statute the purpose of which was to prohibit that right of alienation, and especially where the conveyance is in favor of a spouse. The older practitioners will remember that in some instances the procedure was for a husband to deed his separate property to a third party who would in turn deed it back to the marital community—in the habendum of that deed was language to the effect that the conveyance was to the husband and wife grantees as community property. This procedure, of course, was a throwback to technical common law conveyancing. In time the procedure became simply that one spouse would simply convey to himself or herself and the other spouse, "to be held as community property." Apparently under the law of England it had been thought at one time that a person could not execute a conveyance to himself. But, the law of England did not have the concept of a marital entity—which is, of course, the foundation of community property.

The basic issue here is whether the 1972 "Agreement" divested the husband of any separate estate in the described real property, and transferred his interest to the two of them as community property. Clearly it did so. Without doubt the parties in 1972 had in mind to take advantage of I.C. § 32–921 before it became ineffective; but equally without doubt that happy couple who then sought to avoid the expenses of probate, went beyond doing that which was necessary to do so, and in the process all of the described real property became the marital couple's community estate. That which they did is not ambiguous, is readily ascertainable, and it is unrealistic to say, as does Justice Bakes, there should be a "swearing match" some twelve years later to ascertain if they intended to do what they did.

In conclusion, I mention that I have written separately only to make it perfectly clear that prior to I.C. § 32–921, there was

not (and I suggest could not have been), any prohibition against an outright conveyance by one spouse to the other, or by one spouse to both spouses as community property.[1] For certain, however, absent fraud, the spouse executing the conveyance of his separate property had to live with that act. I.C. § 32–921 in essence was a testamentary device which would be given effect at death if not otherwise rescinded or modified. Today we have reviewed an instrument which was a conveyance *in praesenti.*

Other than for the expression of differing views herein set forth, I concur in the Court's opinion. I concur in the judgment affirming the courts below.

BAKES, Justice, dissenting:

I must disagree with the majority's analysis of the June, 1972, agreement between these parties. The agreement itself is an ambiguous document, and thus no clear intention of the parties can be gleaned from a reading of the document itself. The majority focuses upon language from one paragraph of one part of the agreement, which reads, "That the said described real property ... shall be considered and is hereby declared to be community property and to the extent necessary we do hereby transfer, grant and convey the described property to each other as community property," concluding, as a matter of law, that the agreement transmuted the separate property into community property. Yet other parts of the agreement display another intent on the part of the parties in executing this agreement. The title of the document reads "Agreement as to Status of Community Property *After Death of One of the Spouses.*" (Emphasis added.) In addition, no mention is made of the language in the agreement which indicates that the parties intended the agreement only to take effect upon death, such as that portion of the agreement which states that the parties enter into this agreement with the intent and the desire that the real property named within the agreement "shall pass without delay and expense, upon the death of either, to the survivor." Another part of the agreement indicates that "on the event of the death of either of the aforementioned parties, while the other party survives, the whole of said community property as herein defined and described shall immediately vest in the surviving party in fee simple." Even that portion of the agreement focused upon by the majority is ambiguous in that, while the property is "hereby declared" to be community property and "hereby transfer[ed], grant[ed] and convey[ed]," at the same time the paragraph indicates that this will affect the property only "to the extent necessary." It is by no means clear that as a matter of law the parties intended the agreement to have the effect of transmuting separate property of one of the spouses into community property. Such a large gift of property from one spouse to another should not be based upon an ambiguous document without first having the parties' intentions determined as a matter of fact.

1. Prior to the Court's opinion issued today, and prior to *Stockdale,* it had never occurred to me that anyone doubted the right of one spouse to convert separate property into community property of the marital estate. The procedure for doing so was probably suggested by I.C. § 55–104:

> **55–104. Interests in common.**—Every interest created in favor of several persons in their own right is an interest in common, unless acquired by them in partnership, for partnership purposes, or unless *declared in its creation* to be a joint interest, or unless acquired as community property." (Emphasis added.)

Our esteemed teacher, Dr. W.J. Brockelbank, in his book on the subject of community property, apparently saw no need to discuss the utilization of the declarations of a habendum clause in interspousal conveyances creating a community estate in the marital community. But he did discuss the application of the above statute in connection with the creation of joint tenancies in a community property state. In particular, Dr. Brockelbank gave credit to the views of R.D. Merrill that "since spouses are free to convey their interests, they may agree that property to be conveyed to them may be conveyed to them and held in joint tenancy." Brockelbank at p. 238. I submit that that which the parties may do where joint tenancy estates are concerned can also be done where community property estates are concerned. It was ever thus.

The obvious ambiguity in the agreement makes it imperative that the question of the intent of the parties in entering into the contract be determined as a matter of fact, based upon extrinsic evidence concerning all of the circumstances surrounding the execution of the agreement. At each level of this controversy's course through the legal system, the agreement has been interpreted to be a transmutation *as a matter of law*, and a finding of the intent of the parties as a *matter of fact* has never been made. The magistrate, in his written findings, relied solely upon the language of the agreement in determining the status of the parties' property.

"The written intentions and declarations of the parties are, in this case, the best evidence of the status of the parties' property. By giving effect to those written declarations and intentions, the court must find the property described in the agreement to be community property."

In a later supplemental finding of fact, the magistrate again relied solely on the agreement itself, and not upon any extrinsic evidence of the intent of the parties in declaring the property to be community property.

At the district court level, the district court first indicated the possibility that an oral or informal transmutation had occurred, but also noted that an opinion of the Idaho Court of Appeals had refused to recognize oral transmutations. However, the district court then ruled that, as a matter of law, "the 1972 agreement gave formal recognition to this situation by clearly stating that the two parcels in question were the community property of the parties." The district court was deciding this not as a *de novo* court, but on appeal, as a matter of law.

Finally, on appeal to this Court, the majority again overlooks the ambiguities contained in the agreement and makes the statement that "where a contract is clear and unambiguous, determination of its meaning and legal effect are questions of law to be decided by the court." Thus, the Court disregards the ambiguities contained within the agreement itself, even within the portion of the agreement relied upon by the majority. While the majority cites the correct rule of law as to unambiguous documents, it fails to recognize the equally weighty rule that where terms of a contract are ambiguous, its interpretation and meaning is a question of fact to be determined by the trier of fact. *See Pocatello Industrial Park v. Steel West*, 101 Idaho 783, 621 P.2d 399 (1980); *Werry v. Phillips Petroleum Co.*, 97 Idaho 130, 540 P.2d 792 (1975).

In a recent case we were faced with a very similar situation wherein we were interpreting a workman's compensation agreement which had two sentences that seemingly conflicted with each other, and both sides were singling out the sentence that supported their position and urging this Court to rule in their favor based on their particular sentence, ignoring the sentence which supported the opposing side.[1] *See Woodvine v. Triangle Dairy Co.*, 106 Idaho 716, 682 P.2d 1263 (1984). In *Woodvine* we determined that the compensation agreement was ambiguous and that we

---

**1.** In *Woodvine* the Court was interpreting a compensation agreement entered into between an employee-claimant and the employer for injuries which had been sustained in the course of the employment. The agreement, which had been approved by the Industrial Commission, provided in Part I for time loss paid; Part II provided, "The employee has been given a permanent disability and/or impairment rating of ....."; Part III provided for medical payments made to date. Finally, the agreement concluded with the provision, "The employer and surety agree to pay, and the employee agrees to accept, the disability award as set forth above in periodic installments."

The commission had construed the agreement, apparently as a matter of law, to be an agreement for a disability award, not merely an impairment rating. That holding was made against a statutory backdrop of our workmen's compensation law which generally compensates only "disability" and not "impairment." Nevertheless this Court held the agreement to be ambiguous and remanded the matter to the Industrial Commission to determine as a matter of fact, rather than as a matter of law, whether the parties had agreed to settle the claimant's "disability" rather than merely the claimant's "impairment."

were "unable to determine the intent of the parties from a reading of the compensation agreement," and thus ruled that "[w]hether the award was for permanent impairment or permanent disability is dependent on the actual agreement of the parties." We then ruled that the question of what the parties agreed to was a question of fact for the trier of fact. Thus, we reversed the commission's decision, which had been determined as a matter of law, and remanded to the commission to allow a determination of the actual agreement as a matter of fact.

In this case there is no clear indication from a reading of the agreement itself of what the parties intended by executing this agreement. If the parties were told that execution of such an agreement would aid in avoiding the complications of probate, and thus entered into the agreement for the purpose of avoiding such conflicts, then the contract would not constitute a present transmutation of the separate property into community property. Instead, it would have been a contract specifically entered into pursuant to I.C. § 32–921, as urged by appellant. In addition, I.C. § 32–921 would have specifically governed the effect of divorce of the parties upon the agreement, because that statute specifically said that "[d]ivorce of the parties entered into an agreement hereunder shall revoke the agreement." On the other hand, if the parties were aware that a majority of the property in question was the separate property of the husband, and by entering into this agreement they intended to make clear that they had agreed that all of this property would immediately be considered community property at the time they signed the agreement, then the agreement would be a transmutation and would be upheld upon that theory. Either interpretation, decided by the trier of fact as a matter of fact, when supported by substantial competent evidence, would have to be upheld upon appeal by this Court. However, such an interpretation of the agreement as a matter of fact has never been made to this point, and thus, based on our recent decision in *Woodvine*, I would reverse and remand this case to the magistrate's court to allow for the taking of evidence on this point, and the determination by the magistrate as a matter of fact of the intent of the parties.