# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 45277

VERONIKA O. PAPIN,

        Plaintiff-Respondent,

v.

JERRY A. PAPIN,

        Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

**Pocatello, September 2019 Term**

**Opinion filed: December 20, 2019**

**Karel A. Lehrman, Clerk**

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bonneville County. Dane H. Watkins, Jr., District Judge.

The decision of the district court is <u>affirmed in part and reversed in part and remanded for further proceedings.</u>

Smith Woolf Anderson & Wilkinson, PLLC, Idaho Falls, for Appellant. Marty Anderson argued.

Banks Gaffney & McNally, Idaho Falls, for Respondent. John E. Cutler argued.

---

MOELLER, Justice

This is an appeal originating from a complex divorce between Jerry and Veronika Papin. Jerry appeals from the Bonneville County district court's decision, which affirmed in part the judgment of the magistrate court dividing the marital estate. On appeal, Jerry argues that the district court erred in affirming several of the magistrate court's rulings, including: (1) its holding that the marriage settlement agreement was invalid; (2) its holding that the community was entitled to reimbursement for the funds expended towards the mortgage and property taxes on Jerry's separate property home; (3) its characterization of certain property as either separate or community; (4) its valuation of certain property; (5) its award of spousal maintenance to Veronika; and (6) its award of attorney fees to Veronika. For the reasons stated below, we affirm in part, reverse in part, and remand for further proceedings.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

Jerry and Veronika were married on June 3, 2003, when they were thirty-seven and twenty-nine years old, respectively. Throughout the marriage, the parties resided in Jerry's separate property home in Idaho Falls, Idaho. The parties have one child together, J.P., born on April 11, 2010.

Veronika was born in the Czech Republic and moved to Idaho Falls in 2003 after having visited a few times. Czech is Veronika's first language, but she understands four other languages, including English. While married to Jerry, Veronika worked part time at an art gallery in Idaho Falls making minimum wage.

Jerry was born in the United States and has lived in Idaho Falls since 1986. After leaving the Navy in 1991, Jerry began his career as an investment manager. Jerry affiliated his business with IDS Financial Services Inc. (IDS Financial), becoming an independent contractor with the firm. In 1995, IDS Financial changed its name to American Express Financial Advisors (American Express), and in 2005, American Express changed its name to Ameriprise Financial Services, Inc. (Ameriprise). Following the name change, Ameriprise updated its tax policy, thereby allowing Ameriprise affiliated investment managers, such as Jerry, to have their own distinct tax identity. In response, Jerry created Jerry Papin Support Services, LLC (JPSS).

On August 31, 2011, Jerry sold his "Business and Assets" to Brinton Webb, another Ameriprise affiliated investment manager. Jerry and Webb executed an Agreement for Purchase and Sale of the Ameriprise Franchise of Jerry A. Papin, Jr. (Purchase and Sale Agreement) to document the terms of the sale to Webb.[1] The Purchase and Sale Agreement provided that Jerry would sell to Webb his "Business and Assets, as they exist," for $504,000. The "Assets" included Jerry's "client base," which consisted of approximately 250 clients with approximately $45,000,000 in total assets under management (AUM).

On the same day, Jerry and Webb executed the Amendment to the Agreement for Purchase and Sale of Practice (the Amendment). The Amendment explained that Jerry could "solicit clients of the Business . . . to move some or all of their accounts from [Webb's] Ameriprise [business] to [Jerry]'s new Industry business." The parties agreed that Jerry would limit the amount of AUM leaving Webb's Ameriprise business to no more than $12,500,000.

---

[1] Jerry A. Papin, Jr. refers to Jerry Papin, the appellant in this matter.

Should Jerry procure more than that, he would have to reduce the purchase price by five percent for each increment of $1,000,000 in excess of $12,500,000.

The very next day, Jerry executed an operating agreement with Melissa Davis, forming Straight Line Investment Group, LLC (Straight Line), a Nevada corporation. Jerry and Melissa each owned a fifty percent interest in Straight Line. One month later, Jerry amended the Certificate of Organization for JPSS, changing the name to Straight Line Investment Group, LLC (Straight Line (Idaho)).

On November 16, 2011, Jerry informed Webb that he would be transferring $16,900,000 in AUM—*i.e.*, $4,400,000 above the permitted $12,500,000—to his new business, Straight Line. As a result, Jerry reduced the purchase price of $504,000 by twenty five percent. Accordingly, Webb was only required to pay Jerry $378,000 for the sale of the business.

Two years later, Jerry prepared a document entitled: A Covenant Affirming the Separate Business Property of Melissa Davis and Jerry A. Papin, Jr. (the Covenant). The Covenant provides in part:

> *Straight Line Investment Group, LLC*, a business formed under the laws of the state of Nevada, as an evolution and continuation of the Investment management and financial advisory business, established in 1991, previously owned by Jerry A. Papin, Jr. exclusively, was contemplated, designed and has thereafter operated as [Jerry and Melissa's] separate property in proportion to their respective ownership interests.

The Covenant further provides that the spouses of Jerry and Melissa affirm that Straight Line "has been and remains the separate property of [Jerry and Melissa]"; that the spouses do not have and never will have "any lawful right or claim to the intellectual or real property, revenue, proceeds, set-asides, investments, equity or any other thing of value of [Straight Line]"; and that the spouses forever disclaim and waive "all rights, title, and interest which may be vested in either or both of us by virtue of our respective marriages to the Partners in and to all revenues, proceeds, property, assets and other things of value of [Straight Line]" and "any subsequent finding by a jurisdictional authority of any community property or other joint interest." Melissa's husband, Adam Davis, signed the Covenant on October 24, 2013, and Veronika signed the Covenant on November 4, 2013. Neither Jerry nor Melissa signed the Covenant.

On August 13, 2014, after more than eleven years of marriage, Veronika filed for divorce on the grounds of extreme cruelty or, in the alternative, on the grounds of irreconcilable

differences. Jerry requested that the magistrate court grant the divorce on the grounds of adultery or, in the alternative, on the grounds of irreconcilable differences.

Veronika challenged the validity of the Covenant by moving for summary judgment. Veronika argued that the Covenant is not a "binding or valid premarital agreement pursuant to I.C. § 32-916, *et seq.* and in accordance with leading Idaho case law." In response, Jerry filed a cross-motion for summary judgment, arguing that the Covenant is a "valid post marital agreement" and Veronika is not entitled to claim any interest in Jerry's separate property business. The magistrate court granted summary judgment in favor of Veronika, holding that the Covenant was not a valid marriage settlement agreement because (1) it was signed by only one spouse when Idaho Code section 32-917 requires both spouse's signatures and (2) it is unconscionable. The court also held that the Covenant was not an "instrument of conveyance" because there was no specific language of conveyance as required by Idaho Code section 32-906(2). Finally, the court held that the Covenant was not a valid agreement as between Veronika and Adam, *i.e.*, the signatories, for lack of consideration.

Trial commenced on July 1, 2015, and on October 19, 2015, the magistrate court entered its Memorandum Decision. Relevant to this appeal, the court made the following findings: (1) neither party met their burden of proving fault grounds for divorce; (2) community funds were used to pay down the mortgage and property taxes on Jerry's separate property home in the amount of $70,000 and $13,797.80, respectively; (3) the proceeds from the sale of the business are presumed to be community property because Jerry could not trace his separate property; (4) Straight Line is community property because it was started during the marriage; (5) the MPCU joint checking account and all investment accounts are community property because the accounts consist of either the proceeds from the sale of Jerry's business or community income; (6) Veronika is entitled to an award of temporary spousal maintenance; and (7) Veronika is entitled to two-thirds of her requested attorney fees.

Veronika filed a motion for attorney fees and costs, requesting $89,202.57 in attorney fees and $9,787.94 in costs. The magistrate court issued its Memorandum Decision Re: Attorney's Fees, awarding Veronika all of her costs and part of her fees. As for costs, the court awarded Veronika $1,714.19 as costs as a matter of right and $8,073.75 as discretionary costs. As for attorney fees, the court reduced the requested amount by $5,447.50 based on Jerry's objections to which Veronika failed to respond. The court also reduced the amount by

4

$48,372.60 for payments already received from community funds. Finally, the court reduced the amount by one-third, or $15,056.80, because Veronika only prevailed in part. Accordingly, the court held that Jerry was required to pay Veronika a total of $30,113.61 in attorney fees and costs. The court entered the Final Decree of divorce on January 29, 2016.

Jerry appealed both memorandum decisions and the Final Decree to the district court. After oral argument, the district court entered its Memorandum Decision and Order Re: Appeal. The district court affirmed the magistrate court's decision on a majority of the issues, but remanded the following issues: (1) the determination of the appropriate allocation and distribution of the Eastern Idaho Credit Union Account; (2) the determination of the appropriate allocation and distribution of the Ameritrade Account; (3) reconsideration of certain evidence under the proper burden of proof to determine the amount the community is entitled to for reimbursement for the payment of principal and taxes on Jerry's separate residence; (4) the determination of whether any potential tax liability stemming from the 2011 sale of the business should be divided substantially equally; and (5) the determination of expert witness fees as a discretionary cost. Jerry timely appealed.

## II. STANDARD OF REVIEW

The standard for reviewing a district court's decision when it acts in its intermediate appellate capacity continues to be the source of some confusion. *See Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008). However, in *Pelayo v. Pelayo*, 154 Idaho 855, 303 P.3d 214 (2013), we clarified the standard:

> When this Court reviews the decision of a district court sitting in its capacity as an appellate court, the standard of review is as follows:
>
>> The Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.
>
> *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012) (quoting *Losser v. Bradstreet*, 145 Idaho 670, 672, 183, P.3d 758, 760 (2008)). Thus, this Court does not review the decision of the magistrate court. *Id.* "Rather, we are 'procedurally bound to affirm or reverse the decisions of the district court.' " *Id.* (quoting *State v. Korn*, 148 Idaho 413, 514 n. 1, 224 P.3d 480, 482 n. 1 (2009)).

> Prior to *Losser*, when this Court reviewed a district court acting in its appellate
> capacity the standard of review was: "when reviewing a decision of the district
> court acting in its appellate capacity, this Court will review the record and the
> magistrate court's decision independently of, but with due regard for, the district
> court's decision." *Losser*, 145 Idaho at 672, 183 P.3d at 760. After *Losser*, this
> Court does not directly review a magistrate court's decision. *Id.* Rather, it is
> bound to affirm or reverse the district court's decision. *See Bailey*, 153 Idaho at
> 529, 284 P.3d at 973; *Korn*, 148 Idaho at 415 n. 1, 224 P.3d at 482 n. 1.

*Pelayo*, 154 Idaho at 858–59, 303 P.3d at 217–18. Accordingly, we will review the district court's decision to determine whether it correctly addressed the issues raised on appeal.

## III. ANALYSIS

### A. The marriage settlement agreement.

Jerry contends that the district court erred in affirming the magistrate court's finding on summary judgment that the Covenant was not a valid marriage settlement agreement. According to Jerry, the Covenant is a valid marriage settlement agreement because it was executed in accordance with the law and properly conveys any interest Veronika may have in Straight Line to Jerry, including all revenue. Veronika contends that the Covenant is not a valid marriage settlement agreement because Jerry is not a party to it, it lacks "mutuality and consideration," and it was not executed in accordance with the law.

"On appeal from the grant of a motion for summary judgment, this Court employs the same standard as used by the [lower court] originally ruling on the motion." *Intermountain Forest Mgmt., Inc. v. Louisiana Pacific Corp.*, 136 Idaho 233, 235, 31 P.3d 921, 923 (2001). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a).

> Where the parties have filed cross-motions for summary judgment relying on the
> same facts, issues and theories, the parties effectively stipulate that there is no
> genuine issue of material fact that would preclude the district court from entering
> summary judgment. *Davis v. Peacock*, 133 Idaho 637, 640, 991 P.2d 362, 365
> (1999) (citations omitted). However, the mere fact that both parties move for
> summary judgment does not in and of itself establish that there is no genuine issue
> of material fact. *Kromrei v. AID Ins. Co.*, 110 Idaho 549, 551, 716 P.2d 1321
> (1986) (citing *Casey v. Highlands Ins. Co.*, 100 Idaho 505, 507, 600 P.2d 1387,
> 1389 (1979)). The fact that the parties have filed cross-motions for summary
> judgment does not change the applicable standard of review, and this Court must
> evaluate each party's motion on its own merits. *Stafford v. Klosterman*, 134 Idaho
> 205, 207, 998 P.2d 1118, 1119 (2000) (citing *Bear Island Water Ass'n, Inc., v.
> Brown*, 125 Idaho 717, 721, 874 P.2d 528, 532 (1994)).

*Intermountain Forest Mgmt., Inc.*, 136 Idaho at 235, 31 P.3d at 923.

i. The magistrate court did not err in raising the issue of consideration *sua sponte* because it provided the parties with adequate notice and an opportunity to respond.

Jerry contends that the magistrate court improperly raised *sua sponte* several issues regarding the validity of the Covenant during the hearing on the parties' motions for summary judgment because he was not provided with adequate notice and an opportunity to respond. Veronika contends that the magistrate court did not raise any issues *sua sponte* because Jerry placed the legitimacy of the Covenant at issue when he filed a cross-motion for summary judgment asserting its validity.

Generally, "[t]he [lower] court may not grant summary judgment on a ground raised *sua sponte*." *Sales v. Peabody*, 157 Idaho 195, 201, 335 P.3d 40, 46 (2014). However, this is not a blanket rule:

> We do not suggest that summary judgment may never be entered by a court *sua sponte* or on grounds other than those raised by the moving party. . . . [I]n such event, the party against whom the judgment will be entered must be given adequate advance notice and an opportunity to demonstrate why summary judgment should not be entered.

*Mason v. Tucker and Assoc.*, 125 Idaho 429, 432, 871 P.2d 846, 849 (Ct. App. 1994).

Here, Veronika filed a motion for summary judgment seeking to invalidate the Covenant. Veronika argued that the Covenant was not a valid marriage settlement agreement because there was no meeting of the minds and it is unconscionable. Jerry objected and filed a cross-motion for summary judgment, asking the magistrate court to find that the Covenant was a "valid post marital agreement." During the hearing on both motions, the magistrate court expressed its concern that the parties had not addressed several issues relating to the validity of the Covenant:

> [Magistrate court]: And as I read through -- in preparation for today, I read through a great deal of the information with regards to the summary judgment motion. And I had some screaming issues that neither of you have addressed.
> . . . .
> [Magistrate court]: And so what I have in the -- in the briefing and in the documents doesn't begin to cover the issues that at least seem to me -- for example, it's referred to as a marital settlement agreement by -- at least by Ms. Gaffney.
> I know she referred to it as that, and I think that that's probably a description that is not uncomfortable for you, Mr. Anderson, in talking about it in those terms.
> And yet it's not a marital settlement agreement because it's not an agreement between these parties. It's an agreement ostensibly between Mrs. Papin and the husband of Mr. Papin's business partner.

So it's not a marital settlement agreement. He's not a party to it.

. . . .

[Magistrate court]: Whether she understood the agreement, that's a question of fact. But those aren't the only issues. And especially when it's -- it's an agreement between Mrs. Papin and somebody else who isn't a party to this litigation.

[A]nd where is the consideration to make that agreement binding?

After voicing its concerns, the magistrate court continued the hearing to allow the parties an opportunity to brief any additional issues relating to the validity of the Covenant. The parties had approximately one month to supplement their motions, and both took the opportunity to do so. In her supplemental memorandum, Veronika alleged that the Covenant was not a valid marriage settlement agreement because it was not signed by both spouses and it does not convey anything to Jerry, but merely attempts to affirm the separate nature of the business.

In its decision on summary judgment, the magistrate court ultimately found that the Covenant was not a valid marriage settlement agreement because it was not signed by both spouses and it was unconscionable. The court also found that the Covenant was not an "instrument of conveyance" because it did not contain specific language of conveyance. Finally, the court found that the Covenant was not a valid agreement as between Veronika and Adam because it lacked consideration.

On intermediate appeal, Jerry argued that the magistrate court improperly raised several issues *sua sponte*, including the issues that were addressed in Veronika's supplemental memorandum as well as the additional issues of consideration, conveyance, and disclosure that were never raised by Veronika. The district court held that the only issue that was raised *sua sponte* was the issue regarding consideration, but it was not improper for the magistrate court to do so because the parties had notice and an opportunity to brief the issue. We agree with the district court.

As to the issue of disclosure, we hold that Jerry raised the issue himself when he filed a cross-motion for summary judgment asking the court to find that the Covenant was a "valid post marital agreement." To have a "valid post marital agreement," the Covenant would have to be *valid*, which includes disclosing all pertinent information within each party's knowledge. "The marital relationship imposes the high duty of care of a fiduciary on each of the parties. This duty continues until the moment of the marriage's termination." *Golder v. Golder*, 110 Idaho 57, 60, 714 P.2d 26, 29 (1986).

8

> This fiduciary duty extends to the parties' negotiations leading to the formation of the property settlement agreement during marriage, and requires, at least, a *disclosure* by both parties of all information within their knowledge regarding the existence of community property and of pertinent facts necessary to arrive at a reasonable valuation of the property. Like a business partner, each spouse is free to adopt a position favorable to himself or herself regarding the property's valuation, its inclusion in the community, or other such issues. They are not free, however, to resolve such issues unilaterally by concealing the very existence of particular items or amounts of property.

*Id.* (emphasis added) (quoting *Compton v. Compton*, 101 Idaho 328, 336, 612 P.2d 1175, 7783 (1980)). "When such an agreement is attacked the husband has the burden of clearly showing that it was fair in every particular." *Sande v. Sande*, 83 Idaho 233, 238, 360 P.2d 998, 1001 (1961) (quoting *Hay v. Hay*, 40 Idaho 159, 169, 232 P. 895, 897 (1924)). Accordingly, because Jerry himself asked the magistrate court to uphold the validity of the Covenant, the court did not raise the issue of disclosure *sua sponte*.

As to the issue of conveyance, we similarly hold that Jerry raised the issue himself. In his supplemental reply to his cross-motion for summary judgment, Jerry cited to section 32-906(2) and asserted that "the *Covenant* property [sic] conveys Veronika's interest, if she had one, to Jerry in the business enterprises together with all revenue derived therefrom." During the continued hearing on the motions for summary judgment, Veronika asserted that section 32-906(2) is inapplicable because, according to the Covenant itself, Veronika is not conveying anything; both the title and language of the Covenant explain that Veronika is merely *affirming* the separate nature of the business. Jerry rebutted Veronika's argument by asserting that the Covenant "is clearly a conveyance." Accordingly, the magistrate court did not raise the issue of conveyance *sua sponte*.

Finally, as to the issue of consideration, we hold that the magistrate court did in fact raise that issue *sua sponte*. Nevertheless, it was not error for the court to do so because it provided the parties with both notice—by identifying the issue during the hearing on the motions for summary judgment—and an opportunity to address the issue—by offering the parties additional time to supplement their briefing. Therefore, although the magistrate court *sua sponte* raised the issue of consideration, it was not error for the court to do so. Accordingly, we affirm the district court on this issue.

ii. <u>The district court erred in affirming the magistrate court's finding that the Covenant was procedurally invalid on the alternate grounds that it did not contain the grantee's mailing address.</u>

9

The magistrate court found that the Covenant was not a valid marriage settlement agreement because it was signed only by Veronika, thereby failing to satisfy the requirements of Idaho Code section 32-917. On intermediate appeal, the district court upheld the magistrate court's finding on alternative grounds. The district court held that, although section 32-917 only requires the grantor's signature, it further requires the inclusion of the grantee's mailing address, which the Covenant lacks.

On intermediate appeal, the district court may affirm a magistrate court's decision that is based upon an erroneous legal theory if an alternative legal basis can be found to support the decision. *See, e.g., Campbell v. Parkway Surgery Ctr., LLC*, 158 Idaho 957, 966, 354 P.3d 1172, 1181 (2015) ("The district court was permitted to affirm the magistrate court's judgment on the correct legal theory if the magistrate's legal basis for supporting its judgment was incorrect."). Thus, we must initially determine whether the district court correctly determined that section 32-917 only requires the grantor's signature and the grantee's mailing address.

"The interpretation of a statute is a question of law over which this Court exercises free review." *Webb v. Webb*, 143 Idaho 521, 525, 148 P.3d 1267, 1271 (2006). In Idaho, property rights of husband and wife are governed by Chapter 9, Title 32, Idaho Code, "unless there is a marriage settlement agreement entered into during the marriage containing stipulations contrary thereto." I.C. § 32-916. Section 32-917 provides that "[a]ll contracts for marriage settlements must be in writing, and executed and acknowledged or proved in like manner as conveyances of land are required to be executed and acknowledged or proved." Idaho Code section 55-601 addresses how conveyances of land are to be executed and acknowledged or proved: "A conveyance of an estate in real property may be made by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing. The name of the grantee and his complete mailing address must appear on such instrument."

In *Chavez v. Barrus*, we addressed the issue of whether a marital property settlement agreement is required to contain formalized language of conveyance to be a valid settlement agreement. 146 Idaho 212, 220, 192 P.3d 1036, 1044 (2008). In doing so, we began by recognizing that certain minimum requirements must be met when assigning the interests in the marital homestead through a settlement agreement:

> "All contracts for marriage settlements must be in writing, and executed and acknowledged or proved in like manner as conveyances of land are required to be executed and acknowledged or proved." I.C. § 32-917. The general rule for

10

conveyances of land states: "A conveyance of an estate in real property may be made by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing. The name of the grantee and his complete mailing address must appear on such instrument." I.C. § 55-601; *see also* I.C. § 9-503 (stating that transfers of real property must be in writing).

*Id*. We held that the agreement between the husband and wife satisfied the requirements of section 32-917 without specifying which of the requirements had been satisfied. We now take the opportunity to do so.

First, it is an absolute requirement that the marriage settlement agreement be in writing. *See* I.C. § 32-917 ("All contracts for marriage settlements must be in writing . . . ."); I.C. § 55-601 ("A conveyance of an estate in real property may be made by an instrument in writing . . . ."). Second, only the grantor, *i.e.*, the conveying spouse, is required to sign the settlement agreement. *See* I.C. § 55-601 (explaining that the instrument of conveyance need only be "subscribed by the party disposing of the same."). Third, the settlement agreement must contain the mailing address of the grantee spouse, but *only* if the property that is being conveyed is real property. This requirement, found in section 55-601, is only necessary for conveyances of real property because the address of the grantee is needed for property tax purposes. This holding is also supported by the language found in section 32-917, which provides that marriage settlement agreements need only be "executed and acknowledged or proved in *like manner* as conveyances of land are required to be *executed* and *acknowledged* or *proved*." (Emphasis added). "Like" is defined as "[e]qual in quantity, quality, or degree; corresponding exactly" or "[s]imilar or substantially similar; of much the same nature." LIKE, Black's Law Dictionary (11th ed. 2019). We interpret the Legislature's use of the phrase, "in like manner as conveyances of land," to only refer to the acts of executing, acknowledging, and proving the agreement. The address requirement would only apply to "conveyances of land." Thus, the grantee's mailing address is only necessary in a marriage settlement agreement when title to real property is being conveyed or modified.

Looking to the marriage settlement agreement in this case, we hold that it satisfies the procedural requirements of section 32-917, and is therefore, procedurally valid. First, the Covenant satisfies the requirement that it be in writing. Second, the Covenant satisfies the requirement that it be signed by the grantor spouse. The Covenant was signed by Veronika (as well as Adam Davis) and notarized by a notary public. Veronika is the grantor because she is the one conveying property—*i.e.*, any interest she may have in Straight Line. Thus, as between

11

Veronika and Jerry, only Veronika's signature is required under section 32-917. Finally, because the only property that is being conveyed is the interest Veronika may have in Straight Line—which did not include any real property—Jerry's mailing address, as the grantee, was not required. Therefore, the Covenant satisfies all of the procedural requirements of section 32-917. Accordingly, the district court erred in affirming the magistrate court's finding that the Covenant was procedurally invalid on the alternative grounds that it lacked the grantee's mailing address.

      iii.    <u>The Covenant is not a valid marriage agreement between Jerry and Veronika agreement because it lacks consideration.</u>

The issue of consideration for the Covenant is difficult to analyze on appeal because both lower courts considered the issue as between Veronika and *Adam Davis*, the two signatories to the Covenant, rather than as between Veronika and *Jerry*. The magistrate court held that the Covenant was invalid due to the lack of consideration.[2] The district court upheld the magistrate court's holding, explaining that "[n]o question of material fact existed that the Covenant was unsupported by consideration between Veronika and Adam."

We affirm the district court, but not because of the lack of consideration between Veronika and Adam. Although they were both signatories, the Covenant does not attempt to address the respective rights of Veronika and Adam to *each other*. In other words, the rights Veronika allegedly "affirmed" to Jerry were all to the benefit of Jerry, not Adam. Therefore, for the Covenant to be a valid marriage settlement there must be consideration between Veronika and Jerry. The evidence in the record firmly establishes that consideration is lacking as between the parties to this appeal, *i.e.*, Veronika and Jerry.

"To be enforceable at law, an agreement must be supported by valid consideration." *Weisel v. Beaver Springs Owners Ass'n, Inc.*, 152 Idaho 519, 526, 272 P.3d 491, 498 (2012). "To constitute consideration, a performance or a return promise must be bargained for. A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Fischer v. Croston*, 163 Idaho 331, 339, 413 P.3d 731, 739 (2018) (quoting Restatement (Second) of Contracts § 71 (1981)). "The party that asserts consideration is either lacking or has failed to support a written agreement bears the burden of proving that fact by a preponderance of the evidence." *Weisel*, 152 Idaho at 526, 272 P.3d at 498.

---

[2] As will be discussed later in this Opinion, the community had acquired an interest in the property which was the subject of the Covenant.

The Legislature has specifically provided that *premarital* agreements are enforceable without consideration. *See* I.C. § 32-922 ("A premarital agreement . . . is enforceable without consideration. . . ."). The Uniform Law Comments explain that the marriage itself is the consideration. In addressing marriage settlement agreements, or post-marital agreements, the Legislature could have included similar language in section 32-917, but chose not to do so. Nevertheless, Jerry argues that this Court has not required consideration in the past for post-marital conveyances. *See, e.g., Barrett v. Barrett*, 149 Idaho 21, 232 P.3d 799 (2010); *Reed v. Reed*, 137 Idaho 54, 44 P.3d 1108 (2002); *Bliss v. Bliss*, 127 Idaho 170, 898 P.2d 1081 (1995); *Wolford v. Wolford*, 117 Idaho 61, 785 P.2d 208 (1990); *Hall v. Hall*, 116 Idaho 483, 484, 777 P.2d 255, 256 (1989); *Suchan v. Suchan*, 106 Idaho 654, 682 P.2d 607 (1984). However, none of these cases support Jerry's argument. In fact, these cases support the opposite conclusion as most of the settlement agreements contain some form of at least nominal consideration.[3] Accordingly, we cannot hold that, similar to premarital agreements, marriage settlement agreements are enforceable without any consideration. Accordingly, parties entering into a marriage settlement agreement must follow the general rules of contract law, including the requirement of consideration.

Here, Jerry argues that the consideration was the business itself. Had Veronika and Adam not signed the Covenant, then he and Melissa would not have entered into business with each other in the first place. If the Covenant had been signed contemporaneously with the creation of Straight Line, then this argument might be more persuasive. However, Jerry and Melissa started Straight Line in September 2011 and the Covenant was not executed until the fall of 2013. By then Jerry and Melissa had been in business together for over two years, so obtaining releases from their spouses was clearly not a part of the agreement. Additionally, Jerry argues that, without the Covenant, Jerry and Melissa would not have been able to increase their wages, which was a direct benefit to Veronika and Adam. However, once again, Jerry increased his salary before the execution of the Covenant. Moreover, Jerry explained all of this in an

---

[3] *See, e.g., Bliss*, 127 Idaho at 174, 898 P.2d at 1085 ("[T]he deed unambiguously declares that it is 'in consideration of ONE DOLLAR and OTHER GOOD and VALUABLE CONSIDERATION.' "); *Hall*, 116 Idaho at 484, 777 P.2d at 256 ("Where, as here, the consideration clause clearly recites that the transfer was made 'For Value Received,' parol evidence is not admissible to contradict the deed by attempting to show the transfer was in part a 'gift' rather than 'for value.' "); *Suchan*, 106 Idaho at 658, 682 P.2d at 611 ("NOW THEREFORE, for and in consideration of the Sum of One ($1.00) Dollar in hand paid, and other valuable consideration . . . and also, in consideration of the love and affection that each of said parties bears for the other, and the mutual benefits to be derived by the parties hereto . . . .").

acknowledgement between himself and Melissa, which was executed after Veronika filed for a divorce and after she moved to set aside the Covenant as invalid. Jerry's attempt to retroactively recite consideration for the agreement is insufficient. The Covenant as it currently stands lacks any consideration because Veronika agreed to give up or transmute any community interest she may have had in the business in exchange for nothing.

In sum, although the lower courts analyzed the consideration issue as between the signatories, *i.e.*, Veronika and Adam, the real question was whether consideration existed as between the spouses, *i.e.*, Veronika and Jerry. Based on our reasoning above, we hold that it did not. Without consideration the Covenant is invalid and cannot be enforced by Jerry. Accordingly, the district court did not err in affirming the magistrate court's grant of summary judgment in favor of Veronika as there is no genuine issue that the Covenant is not a valid marriage settlement agreement because it lacks consideration. *See BECO Const. Co., Inc. v. J-U-B Engineers, Inc.*, 145 Idaho 719, 724, 184 P.3d 844, 849 (2008) ("It is well established that this Court will use the correct legal theory to affirm the correct decision of a district court even when it is based on an erroneous legal theory." (quoting *J.R. Simplot Co., Inc. v. Idaho State Tax Comm'n*, 120 Idaho 849, 853, 820 P.2d 1206, 1210 (1991))).

## B. The investment management business(es).

Jerry has raised several issues regarding the lower courts' characterization and valuation of the investment management business as it has existed throughout the marriage. Jerry contends that the district court erred in affirming the magistrate court's finding that the investment management business, as it existed in 2011, was community property. Jerry argues that this is due to the lower courts' failure to understand the nature of the business. Jerry also contends that the district court erred in affirming the magistrate court's finding that the proceeds from the 2011 sale of the business were community property. Finally, Jerry contends that the district court erred in affirming the magistrate court's characterization and valuation of Straight Line.

"The characterization of property as either community or separate presents a mixed question of law and fact." *Kawamura v. Kawamura*, 159 Idaho 1, 3, 355 P.3d 630, 632 (2015). "Although the manner and method of acquisition of property are questions of fact for the trial court, the characterization of an asset in light of the facts found is a question of law over which we exercise free review." *Id.* "Whether a specific piece of property is characterized as community or separate property depends on when it was acquired and the source of the funds

used to purchase it. The character of property vests at the time the property is acquired." *Id.* at 4, 355 P.3d at 633 (quoting *Kraly v. Kraly*, 147 Idaho 299, 303, 208 P.3d 281, 285 (2009)). "[A]ll property owned by a spouse before marriage and property acquired after marriage with the proceeds of separate property remain that spouse's separate property." *Baruch v. Clark*, 154 Idaho 732, 737, 302 P.3d 357, 362 (2013) (citing I.C. § 32-903). "However, all other property acquired after marriage—including income on separate property—is community property." *Id.* (citing I.C. § 32-906). Therefore, there is a rebuttable presumption that all property acquired during marriage is community property. *Reed*, 137 Idaho at 58, 44 P.3d at 1113. "[A] party wishing to show that assets acquired during marriage are separate property bears the burden of proving with reasonable certainty and particularity that the property is separate." *Baruch*, 154 Idaho at 737, 302 P.3d at 362.

Jerry started his investment management business in 1991. Accordingly, the business in its entirety was Jerry's separate property to begin with and he was entitled, initially, to a presumption that the business remained his separate property throughout the marriage. However, during the marriage Jerry sold the "business," or at least a portion thereof, and started a new business. Accordingly, it is necessary to characterize the business as it has existed and evolved throughout the marriage, which begins with an accurate understanding of the nature of the business.

     i.    <u>The lower courts correctly understood the nature of Jerry's investment management business.</u>

Jerry contends that his investment management business consists of the client relationships, or his "book of business," and his skill and expertise as an investment manager, neither of which can exist without the other. Veronika contends that the client relationships have a value separate and apart from Jerry, as evidenced by the sale in 2011. We agree with Veronika.

Jerry's investment management business, though based in part on his personal skill and expertise, also consists of the client relationships, or the "book of business," which is capable of existing without Jerry. For example, in 2011, Jerry sold his "business" to Brinton Webb, another Ameriprise affiliated investment manager. According to the Purchase and Sale Agreement, Jerry agreed to sell his "Business and Assets, as they exist," for $504,000, which was to be paid in forty-eight equal installments of $10,500. The "Business" was providing "fee-based investment management and other like services," and the "Assets" included Jerry's "client base," which consisted of 264 clients with approximately $45,000,000 in assets under management (AUM).

Accordingly, the "Business" and the "Assets" can function without Jerry. Jerry even stated that "Mr. Webb did not buy an entity or portion thereof such as JPSS or [Straight Line (Idaho)], but rather *client relationships*." (Emphasis added). Therefore, although Jerry's skill and expertise is an essential part of the business—a part that remains separate—the client relationships, the "Assets" or the "book of business," are also part of the business, and a part that can be characterized and valued, as discussed below.

ii. <u>The district court did not err in affirming the magistrate court's finding that the proceeds from the sale of the "book of business" were community property.</u>

Jerry contends that the district court erred in affirming the magistrate court's finding that the proceeds from the sale of the "book of business" were community property because Jerry could not accurately trace his separate property. Jerry argues that this was error because his expert was able to trace his separate property interest, which consisted of all client accounts acquired before marriage, or ninety-seven percent of the $367,500 sale proceeds. Veronika contends that the community property interest would also consist of any change to the customer base through change in both clients and AUM between the date of marriage and the date of sale.

"As a general rule, the natural enhancement in value of separate property during coverture does not constitute community property; however, to the extent an enhancement in value is due to community efforts, labor, industry or funds, it falls into the community." *Speer v. Quinlan, In and For Lewis Cnty.*, 96 Idaho 119, 127, 525 P.2d 314, 322 (1973) (quoting *Gapsch v. Gapsch*, 76 Idaho 44, 52, 277 P.2d 278, 282 (1954)); *see also Hoskinson v. Hoskinson*, 139 Idaho 448, 460, 80 P.3d 1049, 1061 (2003) ("[T]he natural enhancement of a separate property asset due to market trends, inflation, etc., and which is not attributable to community efforts or to rents and profits of the assets, is separate property." (quoting *Mifflin v. Mifflin*, 97 Idaho 895, 896, 556 P.2d 854, 855 (1976))). "[A] so-called profit or gain from the sale of separate property occasioned by a natural enhancement in the value of such property, constitutes a part of the separate estate." *Speer*, 96 Idaho at 127, 525 P.2d at 322. "[I]f community efforts and ability have been expended in the conduct of a separate property business, a proper inquiry . . . is whether the community has received fair and adequate compensation for its labor." *Baruch*, 154 Idaho at 741, 302 P.3d at 366 (quoting *Speer*, 96 Idaho at 128, 525 P.2d at 323).

"Commingling of separate and community property does not convert the separate property to community property where the separate property can be identified through either direct tracing or accounting." *Id.* at 737, 302 P.3d at 362 (quoting *Barton v. Barton*, 132 Idaho

16

394, 396, 973 P.2d 746, 748 (1991)). "When separate and community property are commingled so that tracing is impossible, it is presumed to be community property, and the burden is on the person asserting the separate character of the property." *Martsch v. Martsch*, 103 Idaho 142, 146, 645 P.3d 882, 886 (1982).

Here, Jerry and Veronika each hired certified public accountants to characterize and trace certain property, including the business. Jerry hired David M. Smith and Veronika hired Terri R. Gazdik. Smith opined that "a portion of the proceeds from the partial sale of the business would be community property, if assets acquired during the marriage were sold." According to Smith, "3% of the [$367,500] proceeds [from the partial sale] represent the portion of the business assets acquired during the marriage." The remaining ninety-seven percent represent the portion acquired before marriage. Smith made this determination based on each client's date of acquisition and the 2011 value of each client's AUM.

Veronika's expert, Gazdik, agreed that the sale proceeds consisted both of separate property and community property, but disagreed with Smith's opinion that ninety-seven percent of the proceeds were separate property. According to Gazdik, "[t]he separate property would consist of the value of the base at the time of marriage, not the value as of the date of sale. Any change to this base through change in clientele and change in assets under management (AUM) would be community property." The separate property "would consist of the value of the base at the time of marriage, including any natural appreciation or depreciation in value on these accounts." In other words, the community property portion of the proceeds would consist of the percentage of the client accounts Jerry acquired during the marriage and the percentage of any enhancement in the value of the client account from the date of marriage to the date of sale, unless the enhancement was due to natural fluctuations rather than community efforts.

The magistrate court agreed with Veronika's expert, concluding:

If an account is acquired before marriage, at a certain dollar amount, and that account is increased solely by natural market fluctuations, then it would appear the AUM represented by that account, including its natural enhancement would be separate. However, if that account originally acquired before marriage is substantially increased due to Jerry's efforts to solicit further investments by the account owner, which increased investment is made after marriage, then that portion of the AUM attributable to the increase in the account after marriage would be community property.

The magistrate court explained that, "[b]ecause no tracing was done on the AUM, the court has no way of knowing which was which, and must fall back on statutory presumptions, that the

business sold and sale proceeds were community property." As a result, the court held that the MPCU joint checking account was community property because it was funded with sale proceeds and the investment accounts were community property because they were funded with either sale proceeds or community income. The district court affirmed the magistrate court's findings.

Jerry argues that the lower courts erred by engaging in the analysis of the AUM because "[a]ny increase (or decrease) is a result of the market, client participation and Jerry's separate property expertise." Although changes in the clients' AUM may be due to natural fluctuations and Jerry's separate property skill and expertise, if the AUM appreciated or depreciated as a result of Jerry's efforts during the marriage, the community is entitled to reimbursement for those efforts. Accordingly, tracing of the AUM is necessary in order to determine which portion of the sale proceeds consist of community property. As previously noted, assets under management, or AUM, is the amount of investments that a person, such as an investment manager, manages on behalf of the client. Thus, the AUM is the client's money, and Jerry, Veronika, Straight Line, etc., has no claim to that money. Nevertheless, Jerry's compensation has always been based on the value of the client's AUM: when asked during his deposition to explain his compensation structure, Jerry testified that he and Melissa "charge a percentage of assets under our management." At trial, Gazdik testified that Jerry "gets a fee for the percentage of assets that he manages," and Smith testified that "[t]he asset is the income potential that the client has" and that Jerry and Melissa "earn a percentage off of the account value." To accept Jerry's position would require us to conclude that Jerry's clients were paying him for managing their assets without performing any actual work or labor on his part, essentially reducing his role to that of a mere holding agent of their invested funds. The testimony at trial, and common sense, suggest that Jerry's services involved considerably more effort than just merely watching the value of his clients' portfolios increase or decrease as the market fluctuated day-by-day. Therefore, it seems accurate to conclude that the community property portion of the proceeds would have consisted not only of the percentage of the new clients acquired during marriage, but also the percentage of any increase or decrease in AUM that was due to Jerry's efforts during marriage.

Jerry could not accurately trace the sale proceeds or account for the difference between increases in the AUM that were due to either market fluctuations or his efforts. Smith's

18

opinion—that ninety-seven percent of the sale proceeds were separate property—does not include such an analysis of the AUM, and is therefore, misleading and incomplete. Veronika's expert also could not provide a definitive opinion because she did not have sufficient records from Jerry. For example, Jerry did not report the proceeds from the sale on his individual tax returns from 2011, 2012, and 2013. Furthermore, Jerry did not provide the value of the AUM at the date of marriage or date of acquisition, thereby precluding Gazdik from determining any appreciation or depreciation in the AUM. Finally, Jerry's list of client accounts was created by Jerry without any independent verification. After considering the entirety of the record, including the parties' demeanor while testifying, the magistrate court found that Jerry's testimony as to these matters was not credible, and therefore, it could not accept Smith's testimony which relied upon those representations. It follows then, that without competent evidence establishing the relative percentages of separate and community proceeds, Jerry failed to accurately trace the sale proceeds, which were commingled in a joint checking account. Therefore, the magistrate court did not err in presuming that the proceeds from the sale of the business were community property. Accordingly, we affirm the district court on this issue.

iii.  The district court did not err in affirming the magistrate court's finding that Straight Line is a community property asset because it was started during the marriage with clients who were acquired during marriage.

Jerry contends that the district court erred in affirming the magistrate court's finding that Straight Line is community property because, although it was started during marriage, the majority of the clients that make up Straight Line were acquired prior to marriage. Veronika contends that Straight Line is a community asset in its entirety because all of the clients that make up Straight Line were acquired during marriage.

Again, there is a presumption that all property acquired during marriage is community property. *Reed*, 137 Idaho at 58, 44 P.3d at 1113; *see also* I.C. § 32-906. "Because all property acquired during marriage is presumed to be community property, a party wishing to show that assets acquired during marriage are separate property bears the burden of proving with reasonable certainty and particularity that the property is separate." *Baruch*, 154 Idaho at 737, 302 P.3d at 362. "Where a business is begun with both community and separate funds it generally constitutes community and separate property in the proportion or ratio in which the contributions have been made by the two estates." *Worzala v. Worzala*, 128 Idaho 408, 412, 913 P.2d 1178, 1182 (1996) (quoting *Gapsch*, 76 Idaho at 56, 277 P.2d at 285).

19

Here, Jerry's expert, Smith, opined that "92.9% of the assets under management (AUM) were obtained prior to the date of marriage" and therefore, any compensation derived from those accounts would be Jerry's separate property. Smith made this conclusion by looking to Exhibit 11—a spreadsheet created by Jerry that consists of a list of client accounts with their current AUM as well as the year Jerry acquired the account. According to the spreadsheet, Jerry had $22,366,379.53 in AUM, 7.1 percent of which is attributable to clients who were acquired between 2003 (date of marriage) and 2013 (date of filing for divorce). Veronika's expert, Gazdik, agreed with Smith's opinion in general, but explained that the clients who were reacquired by Jerry after the sale to Webb in 2011 would need to be added to the 7.1 percent, because Jerry, through Straight Line, reacquired those clients during the marriage. The magistrate court agreed with Veronika's expert.

The magistrate court's finding that the clients were acquired during the marriage is supported by substantial and competent evidence because Jerry sold all of his client base to Webb in 2011, thereby requiring Jerry to reacquire clients during the marriage in order to start Straight Line. The 2011 Purchase and Sale Agreement between Jerry and Webb provides that "Buyer shall receive Seller's *entire* Business and Assets, as they shall exist, as of the Transfer Date." (Emphasis added). Jerry represented that his business consisted of "ALL CLIENT GROUPS ASSIGNED TO THE FORMER AMERIPRISE ADVISOR NUMBER OF JERRY A. PAPIN, JR . . . AS OF WEDNESDAY, AUGUST 24, 2011." Attached to the Purchase and Sale Agreement is Exhibit A, which is a list of "all client groups." As of August 24, 2011, Jerry had 264 clients with approximately $45,000,000 in AUM.

On the same day that the Purchase and Sale Agreement was executed, Jerry and Webb executed an Amendment to the Purchase and Sale Agreement. The Amendment explains that Jerry could "solicit clients of the Business . . . to move some or all of their accounts from [Webb's] Ameriprise [business] to [Jerry]'s new Industry business." The parties agreed that Jerry would limit the amount of AUM leaving Webb's Ameriprise practice to no more than $12,500,000. Should Jerry take more than that, he would have to reduce the purchase price by five percent for each increment of $1,000,000 in excess of $12,500,000. Jerry testified that he executed the Amendment because Webb did not want Ameriprise to know that Jerry would be keeping some of his old clients. In other words, he was attempting to create the appearance that

20

he had completely divested himself of his old clients, when in reality he was keeping a significant portion of them.

The next day, Jerry entered into an operating agreement with Melissa Davis, starting their new industry business, Straight Line. At that time, Straight Line was merely a shell as it did not have any clients. In November 2011, Jerry informed Webb that he would be transferring $16,900,000 in AUM to Straight Line. For the purpose of the divorce proceedings, Jerry created a list entitled "AUM sold," showing which clients he transferred to Straight Line.[4] As a result, Jerry reduced the purchase price from $504,000 to $378,000 (a twenty five percent decrease), as required by the terms of the Amendment.

Based on this information, the magistrate court found, and the district court affirmed, that Jerry sold his entire business to Webb during the marriage, thereby having to reacquire those clients. Jerry argues, in essence, that the Purchase and Sale Agreement was just a ploy by Webb to deceive Ameriprise and that the Amendment shows their true intentions, *i.e.*, that Jerry could keep a significant percentage of his client base and move those accounts to Straight Line. Therefore, he suggests that this was not an actual sale of the assets. We reject this explanation for the same reasons the lower courts rejected it.

Although there is conflicting evidence as to whether Jerry sold his entire client list or merely a portion thereof, the conflicting evidence is due to Jerry's attempt to conceal his business dealings with Webb from Ameriprise, which Jerry acknowledges. "Findings of fact that are supported by substantial and competent evidence are not clearly erroneous—even in the face of conflicting evidence in the record." *Woods v. Woods*, 163 Idaho 904, 907, 422 P.3d 1110, 1113 (2018) (quoting *Hull v. Giesler*, 163 Idaho 247, 250, 409 P.3d 827, 830 (2018)). Therefore, we hold that the magistrate court's finding that Jerry sold his entire client list, or "book of business," during the marriage is supported by substantial and competent evidence. That being the case, we similarly affirm the magistrate court's finding that, because Jerry sold all of his clients in 2011 and then solicited them back, "[t]he work Jerry did in soliciting these clients all occurred after the original sale, making the date of acquisition of all these accounts sometime in 2011, after the parties' marriage." Because Jerry was unable to meet his burden of proving with reasonable certainty and particularity that Straight Line was his separate property, we hold that

---

[4] Exhibit 4 was amended several times during trial in order to effectuate Jerry's intent when he created the list. It was amended first to "AUM kept," then to "AUM moved to my platform," and then to "AUM moved to our platform."

the rebuttable presumption applies. Therefore, the magistrate court's finding that Straight Line is community property is supported by substantial and competent evidence. Accordingly, we affirm the district court on this issue.

      iv.    <u>The district court did not err in affirming the magistrate court's valuation of Straight Line.</u>

Jerry argues that the district court erred in affirming the magistrate court's valuation of Straight Line because it is not supported by substantial and competent evidence. According to Jerry, the magistrate court should have disregarded Veronika's expert's testimony regarding the value of Straight Line because she did not use any of the standard and acceptable valuation methods. Veronika contends the magistrate court was within its discretion when weighing the different opinions of value.

"[I]n 'divorce proceedings the determination of the value of community property is within the discretion of the trial court and will not be disturbed on appeal if it is supported by substantial competent evidence.' " *Chandler v. Chandler*, 136 Idaho 246, 249, 32 P.3d 140, 143 (2001) (quoting *Maslen v. Maslen*, 121 Idaho 85, 90, 822 P.2d 982, 987 (1991)). When it comes to valuing a business, our holding from *Chandler* provides guidance:

> Two values must be considered when determining the overall value of a business: intangible assets and tangible assets. The value of the business is determined when the two factors are combined. "Goodwill" (an intangible asset) is an appropriate factor in determining the value of a business. *Olsen v. Olsen*, 125 Idaho 603, 606, 873 P.2d 857, 860 (1994). Goodwill represents "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence. . . ." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993); *see also Harshbarger v. Eby*, 28 Idaho 753, 761, 156 P. 619, 621 (1916); *Loveland v. Loveland*, 91 Idaho 400, 402, 422 P.2d 67, 69 (1967). Goodwill is not the equivalent of future earnings. *See In re marriage of Bookout*, 833 P.2d 800, 804 (Colo. App. 1991), *citing In re Marriage of Lukens*, 558 P.2d 279 (Wash. App. 1976); *Dugan v. Dugan*, 457 A.2d 1 (N.J. 1983) (other citation omitted); *see also In re Marriage of Hall*, 692 P.2d 175 (Wash. 1984) ("Goodwill is a property or asset which supplements the earning capacity of another asset, a business, or a profession, and, therefore, it is not the earning capacity itself."). Rather, "relative to marital dissolution, goodwill represents the ability of a business to earn money after the divorce based on efforts made during the marriage . . . to the extent future profits are likely due to circumstances that exist at the time of the dissolution, they should be reflected in

the value of the business." Richard E. Poley, *Valuing Business Goodwill in a Divorce*, 26 APR COLO. LAW. 53 (1997).

*Id.* at 249–50, 32 P.3d at 143–44. There are many accepted methods used by experts in valuing a business's goodwill. Some of the acceptable methods include the excess earnings method, the straight capitalization of earning method, net asset value method, capitalized excess earnings method, market value method, and the buy/sell agreement method. *See id.* at 250, 32 P.3d at 144. "How the trial court assesses and weighs each method and variable with it, in each particular case, is within that court's discretion." *Id.* Moreover, "[t]hese valuation methods are not the exclusive methods available to a trial court in determining the value of a community business." *Id.*

Here, Veronika's expert, Gazdik, testified that, as of July 5, 2013, the value of Straight Line was $210,826.68, as agreed upon by the parties in the 2013 operating agreement. Of that amount, Jerry's share was fifty percent, or $105,413.34. Gazdik also opined that, as of December 31, 2013, the value of Straight Line was $193,922. Of that amount, Jerry's share was fifty percent, or $96,961. To calculate the most recent value, Gazdik used gross revenues from Straight Line for the most recent twelve months and subtracted the nondiscretionary expenses. The net revenue after subtracting nondiscretionary expenses was $193,922, fifty percent of which was Jerry's interest. Gazdik admitted that under ordinary circumstances, this was not the preferred method for calculating the value of a business; however, due to the lack of documentation provided by Jerry, that was the best she could do. Jerry did not provide an opinion of value, but merely argued that the court should have ignored Veronika's expert.

After considering the evidence presented at trial, the magistrate court held that the business had a value of $105,413.34, as indicated in the 2013 operating agreement between Jerry and Melissa. The district court affirmed the magistrate court's valuation because the court acted within its discretion when it adopted the value placed by Jerry and Melissa in their operating agreement. Jerry argues that the $105,413.34 is only an accurate value of the business "in the event of 'death, catastrophic disability or adjudicated incompetence of any member.' " However, he provides no factual or legal basis as to why the actual value should have been any different.

We hold that the magistrate court did not err in valuing Straight Line. Because Jerry did not provide an opinion of value, the court was left with either Gazdik's opinion of value, which Jerry argued should have been disregarded because her methodology was improper, or the value agreed upon by Jerry and Melissa in the 2013 operating agreement, with which he also

disagreed. Jerry had every opportunity to rebut Gazdik's values with his own, but chose not to do so. As a result, the magistrate court accepted the value assigned by Jerry and Melissa. We hold that the magistrate court did not err in relying on Jerry and Melissa's valuation of Straight Line. Accordingly, we affirm the district court on this issue.

### C. Jerry's separate property home.

During the marriage, Veronika and Jerry lived in Jerry's separate property home. There was an existing mortgage on the home that predated the marriage, and in October 2001, Jerry refinanced the home. According to the refinancing documents, Jerry was required to make 180 payments of $785.42 beginning December 1, 2001. The mortgage was paid off on February 19, 2008, approximately eight years early. None of this is in dispute. What is in dispute is the mortgage balance as of the date of marriage. Jerry's expert estimated that the balance was $40,500, while Veronika's expert estimated that the balance was $72,680.57. Veronika's expert also testified that the community should be reimbursed $13,797.80 for the amount the community expended on property taxes on Jerry's home. The magistrate court agreed with Veronika's expert and held that "[t]he principal balance paid off by the community was $70,000, plus taxes paid by the community of $13,797.80, for a total community interest in the home of $83,797.80[,] half of which amount must be reimbursed to Veronika."

On appeal, Jerry contends that the district court erred in not holding that the magistrate court abused its discretion in accepting the opinion of Veronika's expert as to the balance of the mortgage as of the date of marriage because it was untimely and not supported by substantial and competent evidence. Jerry also contends that both lower courts erred in requiring Jerry to reimburse the community for the amount paid in annual property taxes because property taxes do not enhance the value of the home.

    i.   <u>The district court correctly concluded that the magistrate court did not abuse its discretion in allowing Gazdik to provide an opinion regarding the balance of the mortgage at the date of marriage.</u>

Jerry contends that the magistrate court abused its discretion in allowing Veronika's expert to provide an opinion regarding the balance of the mortgage on Jerry's separate property home at the time of marriage because her opinion was untimely.

"When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discretion standard." *Herrett v. St. Luke's Magic Reg'l Med. Ctr., Ltd.*, 164 Idaho 129, 132, 426 P.3d 480, 483 (2018) (quoting *Edmunds v. Kraner*, 142 Idaho 867, 871, 136 P.3d 338, 342

(2006)). "The Court reviews a trial court's decision admitting or excluding evidence, including the testimony of expert witnesses, under the abuse of discretion standard." *Id.* (quoting *White v. Mock*, 140 Idaho 882, 888, 104 P.3d 356, 362 (2004)). In order to determine whether a trial court has abused its discretion, this Court must determine whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 867, 421 P.3d 187, 198 (2018).

Here, Jerry was aware that there was a dispute regarding the unpaid balance of the mortgage on his separate property home as of the date of marriage. During discovery, Veronika served Jerry with requests for production, requesting the "balance of each such mortgage as of the date of the parties' marriage." Jerry did not provide the requested information in his production. Veronika later sent Jerry a letter asking that he supplement his discovery with the requested information. Jerry once again failed to do so. Subsequently, Veronika filed a motion to compel, which was heard by the magistrate court on March 13, 2015, approximately five weeks before the discovery deadline of April 22, 2015. At the hearing, Jerry argued that he could not find the requested documents. After a short discussion on the matter, Jerry explained that he would provide whatever he could within ten days from the date of the hearing. Jerry once again failed to do so.

On June 29, 2015, three days before trial was set to commence and nine weeks after the discovery deadline had come and gone, Veronika's expert filed a Rebuttal to Corrected Amended Disclosure of Expert Witness Opinions of David M. Smith and Disclosure of Additional Expert Opinions. The disclosure was in response to the second amended opinion of Jerry's expert, which was filed on June 1, 2015, almost six weeks after the discovery deadline. In her amended rebuttal opinion, Veronika's expert provided a new opinion regarding the balance of the mortgage on Jerry's separate property home. In response, Jerry's expert provided a self-created amortization schedule, which assumed a beginning principal balance of $39,921.61.

The magistrate court allowed the exhibit and testimony because the "records for showing where the payments were made from, they've all been out, and you've had them for months." On intermediate appeal, the district court held that the magistrate court did not abuse its discretion in

allowing Gazdik's testimony "based on documents that had been disclosed to Jerry months prior."

We agree with the district court and hold that the magistrate court did not abuse its discretion in allowing Veronika's expert to provide an opinion regarding the balance of the mortgage at the time of the marriage. As explained by the lower courts, there was nothing new about the opinion. Jerry knew for months that Veronika had an interest in determining the amount of the mortgage at the time of marriage. Jerry provided several excuses for why he could not provide Veronika with the requested documents, including that the mortgage records "went missing" and that he could not get the mortgage records because more than seven years had passed. In the end, Jerry was the person responsible for the mortgage and had sole access to the documents that were needed to ascertain how much had been paid during the marriage. Although it was not Jerry's burden to establish the amount of reimbursement, Jerry cannot hinder Veronika's attempt to meet her burden of proof, which it appears he did.

Moreover, the magistrate court allowed Jerry's expert to file a second amended report six weeks after the discovery deadline, which also included new opinions. In fact, the amended report included eight new opinions in the event the court were to find that the Covenant was not a valid marriage settlement agreement. It is pure legal chutzpah for Jerry to allege that he was somehow prejudiced by the late disclosure when it was precipitated by his own late disclosures and lack of responsiveness. Therefore, we hold that the magistrate court did not abuse its discretion in allowing Veronika's expert to provide an opinion as to the balance of the mortgage. Accordingly, we affirm the district court on this issue.

     ii.   The district court did not err in allowing the evidence of the mortgage balance to stand on remand, thereby allowing the magistrate court an opportunity to reweigh the evidence in light of Veronika's burden of proof.

Veronika's expert testified that, as of the date of marriage, the mortgage balance on Jerry's separate property home was $72,680.57, while Jerry's expert testified that the balance was $40,500. The difference in opinion is due to either extra payments made before marriage, extra payments made during marriage, or both. Jerry's expert testified that Jerry paid as much as $3,000 a month towards the mortgage before the parties were married. Veronika's expert testified that accelerated payments were made throughout the marriage. The magistrate court accepted the opinion of Veronika's expert because "Jerry [ ] failed to meet his burden of proof that he substantially paid down the home mortgage between October of 2001, the date of

26

refinance[,] and June of 2003, the date of marriage, and finds that additional payments were made throughout the life of the loan." On intermediate appeal, the district court reversed the magistrate court's finding because it misallocated the burden of proof, which should have been Veronika's. Accordingly, the district court remanded the issue for reconsideration of the evidence in light of Veronika bearing the burden of proof.

Although Jerry agrees with the district court's decision to remand the issue, he now contends that "[t]he error made by the District Court is in permitting the evidence of the amount of alleged community property equity to stand." Jerry argues that the magistrate court's finding is not supported by substantial and competent evidence because the court relied on "records" that do not exist. Such evidence, Jerry argues, should not be permitted to stand on remand.

"[T]his Court reviews the trial court's decision regarding the admission of evidence for an abuse of discretion." *Morgan v. New Sweden Irr. Dist.*, 160 Idaho 47, 51, 368 P.3d 990, 994 (2016). "When this Court remands a case to the [trial] court, 'it is within the discretion of the trial court to determine whether the existing record is sufficient, or should be supplemented, in order to make the required findings of fact and conclusions of law.' " *Id.* (quoting *Akers v. D.L. White Constr., Inc.*, 156 Idaho 27, 34, 320 P.3d 418, 425 (2013)).

Here, the magistrate court reached the logical conclusion that extra payments on the mortgage must have been made at some point in time because the mortgage was paid off approximately eight years early. To support her argument that extra payments were made during marriage, Veronika admitted the following records: the refinancing documents; a Washington Mutual lien release letter dated April 7, 2008, confirming that the mortgage was paid in full in February 2008; a Washington Mutual home loan statement from February 2008, showing that the mortgage was paid off with a check for $3,846.77; and a bank statement from the MPCU joint checking account, showing a mortgage loan payment from 2004 in the amount of $1,500.[5] The magistrate court acknowledged that "[o]nly estimates exist to establish what the principal mortgage amount owing on the home at the date of the marriage was."[6] Nonetheless, the magistrate court relied on the estimates of Veronika's expert and held that community income

---

[5] The MPCU bank statement, which was part of Exhibit 55, is not in the record on appeal. For reasons unknown, Jerry only included half of Exhibit 55 in the record. Nevertheless, neither party disputes that the bank statement showed a payment of $1,500 towards the mortgage.

[6] There is no information in the record as to why neither side was able to obtain a payment history on Jerry's mortgage. Such information is regularly and routinely made part of the record in a variety of case types being litigated throughout the courts of this state.

was used to pay off the mortgage in the amount of $70,000. The court based its conclusion on the belief that Jerry had the burden of proof and had failed to sustain his burden. However, in light of the district court's ruling that the magistrate court erroneously placed the burden of proof on Jerry, the magistrate court should have the opportunity to reweigh the evidence in light of Veronika bearing the burden. It is within the magistrate court's discretion on remand to determine whether the record is sufficient as it currently stands or whether it should be supplemented. Therefore, we affirm the district court's decision to remand this issue to the magistrate court to provide the court with an opportunity to reweigh the evidence.

iii. The district court did not err in affirming the magistrate court's finding that the community was entitled to reimbursement for the funds expended towards the property taxes on Jerry's separate property home because the value of the home was enhanced by the payments.

The magistrate court held that the community was entitled to be reimbursed for the $13,797.80 it expended towards Jerry's separate property tax liability, citing *Swanson v. Swanson*, 134 Idaho 512, 518, 5 P.3d 973, 979 (2000), in support. The district court affirmed the magistrate court, relying on *Swanson* for the proposition that community funds expended on separate property tax liability is reimbursable to the community.

On appeal, Jerry argues that *Swanson* is inapplicable because annual property taxes do nothing to enhance or improve the value of a home, and therefore, cannot be reimbursed. Veronika contends that Jerry benefited directly from these community payments of the property taxes. We agree. Because the community paid the property taxes, Jerry will have the ability to sell his home for its fair market value without having to satisfy any encumbrances due to unpaid tax liens.

"[W]hen community funds are used to enhance the value of one spouse's separate property, such enhancement is community property for which the community is entitled to reimbursement." *Hoskinson*, 139 Idaho at 460, 80 P.3d at 1061 (quoting *Bliss*, 127 Idaho at 172, 898 P.2d at 1083). "[I]n situations where a spouse's equity in property has been increased through the application of community funds to the payment of debt on the property, the measure of reimbursement to the community should be the amount by which such equity is enhanced." *Id*. (quoting *Bliss*, 127 Idaho at 172, 898 P.2d at 1083). The measure of the reimbursement "is the increase in value of the property attributable thereto, not the amount or value of the community contribution." *Id.* (quoting *Bliss*, 127 Idaho at 173, 898 P.2d at 1084). "The party seeking such

28

reimbursement to the community carries the burden of demonstrating that the community expenditures have enhanced the value of the separate property, and the amount of the enhancement." *Id.* (quoting *Bliss*, 127 Idaho at 172, 898 P.2d at 1083).

It is well-established that the party seeking reimbursement must prove that the community funds have enhanced the value of the separate *property*, not the value of the separate property *estate*. For example, in *Bliss*, the husband expended $5,000 in community funds to pay a judgment debt to his former wife and $8,000 in community funds in pre-marital attorney fees, both of which were incurred before his marriage to his then-current wife. 127 Idaho at 171, 898 P.2d at 1082. The lower court ordered the husband to reimburse the community estate $13,000 for the community funds that were expended during the marriage to satisfy his separate property debts. *Id.* at 172, 898 P.2d at 1083.

On appeal, the husband argued that the lower court had no authority to order his separate estate to reimburse the community the $13,000 it paid towards his separate debts. *Id.* We agreed. After reciting the general reimbursement rules, we explained,

> The facts of this case take it outside the direct application of the reimbursement rule as cited in *Suchan*, *Suter*, and *Gapsch*. The community funds were not used to enhance the value of [Mr. Bliss's] separate property. They were used to pay [his] antenuptial, unsecured debts. We can locate no Idaho statute or case allowing reimbursement under these circumstances.

*Id.* at 172–73, 898 P.2d at 1083–84. The wife could not show any enhancement of the value of the husband's separate property through community payments toward his separate property debts. *Id.* at 173, 898 P.2d at 1084. The lower court found that the husband's "separate estate was 'enhanced' by the elimination of those separate debts." *Id.* That is, that his net worth was enhanced, "not the value of any identifiable property." *Id.* Yet "our past precedents have required enhancement of separate *property*." *Id.* Accordingly, we reversed the lower court. *Id.*

In *Swanson*, a case similarly involving the reimbursement of a tax liability, we addressed whether a husband was required to reimburse the community for the expenditure of community funds used to pay the capital gains tax on the sale of his stock. 134 Idaho at 518, 5 P.3d at 979. Relying on *Bliss* and the general reimbursement rules, we explained that it is not the separate property *estate* that must be enhanced, but the separate *property* itself. *Id.* at 518–19, 5 P.3d at 979–80. We therefore held that the funds used to pay the loan on the property and the funds used to pay the husband's separate property tax liability was reimbursable because the funds enhanced

29

the husband's equity in that property. *Id.* at 519, 5 P.3d at 980 (citing *Shovlain v. Shovlain*, 78 Idaho 399, 402, 305 P.2d 737, 738 (1956)).

Similarly, in *Martsch*, we held that a husband was entitled to be reimbursed by the wife for property taxes expended on the wife's portion of the separate property home. 103 Idaho at 147, 645 P.3d at 887. In that case, the husband acquired a piece of property termed the Highland property prior to marriage, thereby making it his sole and separate property. *Id.* at 146, 645 P.3d at 886. During the marriage, the husband made a gift to the wife of an undivided one-half interest in the Highland property, thereby making that one-half interest her sole and separate property. *Id.* Accordingly, at the time of divorce, each spouse owned a one-half interest in the Highland property. *Id.* During the marriage, the husband paid the taxes on the Highland property in the amount of $3,432.32. *Id.* at 147, 645 P.2d at 887. We held that, "[s]ince respondent only owns half the property he is entitled to reimbursement or credit for one half of the amount he paid [on taxes]." *Id.*

Considering *Bliss*, *Swanson*, and *Martsch*, we hold that the community funds that were used to pay the separate property tax liability on Jerry's home are reimbursable to the community because the funds enhanced the value of the separate property home. Therefore, the magistrate court's finding that Veronika met her burden of proving that the value of Jerry's separate property home was enhanced by the community property funds that were expended on the annual property taxes is supported by substantial and competent evidence. Accordingly, we affirm the district court on this issue.

## D. Division of the remaining personal property.

Jerry contends that the district court erred in affirming the magistrate court's division of the personal property and marital debts because the magistrate court relied on exhibits that were admitted into evidence solely for illustrative purposes. Veronika contends that the magistrate court relied on the best information it had, and that allowing the parties essentially a second chance to return before the court just to testify about each item would result in unnecessary time and expense.

> Division of property is a routine and challenging part of most divorce cases:
>
> Idaho courts have a duty not only to dissolve the parties' marital status, but also to make an equitable distribution of the parties' community property in order to disentangle the parties' legal affairs. Idaho courts must undo the bonds of the divorcing parties' community property relationships in order to permit the divorcees to go on with their lives independent of one another. Parties to a divorce

30

"have a right to have their respective interests in their property after they are divorced, definitely and finally determined in the decree which divorces them," so that the prospect of future litigation is less likely. *Shaffer v. Shaffer*, 262 P.2d 763, 764 (Wash. 1953).

*Chavez*, 146 Idaho at 220, 192 P.3d at 1044. "Disposition of property—including valuation and division—is a question of discretion, guided by statutory and case law." *Stewart v. Stewart*, 143 Idaho 673, 677, 152 P.3d 544, 548 (2007). "The disposition of community property is left to the discretion of the trial court, and unless there is evidence in the record to show an abuse of that discretion, the award of the trial court will not be disturbed." *Id.* (quoting *Maslen*, 121 Idaho at 88, 822 P.2d at 985). Additionally, "the determination of the value of community property is within the discretion of the trial court and will not be disturbed on appeal if it is supported by substantial competent evidence." *Id.* (quoting *Chandler*, 136 Idaho at 249, 32 P.3d at 143). Moreover, "[s]imply because evidence was offered to illustrate oral testimony does not deprive it of all evidentiary value." *Higley v. Woodard*, 124 Idaho 531, 536, 861 P.2d 101, 106 (Ct. App. 1993).

During the proceedings below, the parties offered itemized lists of personal property and debts. Veronika offered Exhibits 62 and 69 to illustrate her desired property division, and Jerry offered Exhibits A and C to illustrate his desired property division. The property lists were substantially identical, the main difference being the value assigned to each item. Each of the lists was admitted solely for illustrative purposes. However, the parties agreed that Veronika's property list is "illustrative of what her testimony would be," and that Jerry's property list is "illustrative of his testimony." During trial, the parties had an opportunity to testify regarding their respective lists and how they wanted the items divided. Jerry asked that the court allow the parties to divide all items with a value of $100 or less, which equated to approximately three-fourths of the lists. As for the larger items, Jerry provided testimony for most of the items, including the 2012 Dodge Durango; the 2013 Cadillac CTS; the fixtures in the home; the Prague apartment; the life insurance policy proceeds; and the several bank accounts, including the MPCU accounts, the Roth IRA account, the Simple IRA account, and the Schwab investment account. Jerry was unable to provide testimony for the remainder of the larger items, primarily the fixtures in the home, because it was the end of the last day of trial.[7] Accordingly, the

---

[7] It appears from the record that the parties neither asked for a continuance nor objected to the trial schedule. The parties participated in setting the schedule, including the deadline to reconcile the property lists by the date of the pretrial conference, but they never did so. As a result, the court informed counsel that it was going to be up to the

magistrate court was required to rely, in part, on the parties' property lists in order to divide the remaining personal property.[8]

On intermediate appeal, the district court held that the magistrate court erred in relying on the illustrative exhibits. Yet the district court affirmed the magistrate court's division because the parties were given sufficient time and opportunity to finalize and reconcile their lists, but did not do so. The district court also held that the parties in essence stipulated to the items' existence because the parties' lists were substantially identical and there was substantial evidence in the record, based on the testimony submitted at trial, for the court to divide the property.

We hold that the magistrate court did not abuse its discretion in relying in part on the parties' illustrative property lists in determining how to divide the remaining personal property. Although the parties apparently did not reserve enough time to go through all of the personal property items during trial, they were provided with an opportunity to reconcile their lists before trial, but chose not to do so. Because they chose not to do so, the court informed the parties that "it's going to be up to me to reconcile this list." In its Memorandum Decision, the court explained that it was required to divide the remaining personal property by looking to the illustrative property lists because the parties were unable to "synchronize those lists." The court also held that it was no longer willing to allow the parties to divide the property themselves because they were unable to resolve any of the disputes prior to trial. Therefore, the magistrate court did not abuse its discretion in relying in part on the parties' illustrative property lists because it was the court's duty to divide the community property in order to finalize the divorce. Additionally, due consideration for the finality of outcomes compels us to avoid setting a precedent that would permit parties an evidentiary "do over" whenever they fail to take advantage of the time allocated to them at trial. Accordingly, we affirm the district court on this issue.

### E. Grounds for the divorce.

Jerry contends that the district court erred in affirming the magistrate court's decision to grant the divorce on the grounds of irreconcilable differences instead of adultery. Veronika

---

court to divide the property for them. Again, neither party objected. The parties were also afforded the opportunity to provide written closing arguments wherein they explained how the property should be divided.

[8] We have recently held that the trial court did not err in allowing the jury to consider a demonstrative exhibit during deliberations. *See State v. Weigle*, 165 Idaho 482, 447 P.3d 930 (2019). Thus, the fact finder may appropriately consider evidence contained in illustrative exhibits in making its decisions when appropriate.

contends that both courts correctly concluded that clear and conclusive evidence of adultery did not exist.

Idaho Code section 32-603 provides the grounds upon which a court may grant a divorce, including adultery, extreme cruelty, and irreconcilable differences. Adultery, for purposes of determining grounds for a divorce, is defined as "the voluntary sexual intercourse of a married person with a person other than the offender's husband or wife." I.C. § 32-604. "Divorces based on adultery should be granted only upon very clear and conclusive evidence of the adultery." *Ross v. Ross*, 103 Idaho 406, 409, 648 P.2d 1119, 1122 (1982). On the other hand, "[i]rreconcilable differences are those grounds which are determined by the court to be substantial reasons for not continuing the marriage and which make it appear that the marriage should be dissolved." I.C. § 32-616.

Here, Jerry alleges that Veronika was having an affair with a man named Palo, and that she and Palo had sexual intercourse at least once during the marriage. To prove his allegation, Jerry offered his own testimony, which was strongly disputed at trial, and the testimony from three witnesses: a family friend, Jerry's son from his first marriage, and the magistrate judge who performed the marriage ceremony for Jerry and Veronika years earlier. The family friend, Jennifer Keil, testified that in 2014 Veronika told her that she had a sexual relationship with a person named Palo that commenced in December 2013. Keil also testified that Veronika had asked her to marry Palo so "he could have citizenship" and she would not "lose her alimony." Keil agreed to marry Palo, even though she had never met him before, but backed out when she read on the internet that it was illegal. Jerry's son, Aaron Papin, testified that Veronika had asked one of his friends if she would be interested in marrying her friend from Boston so he could obtain his green card. Finally, retired judge Linda Cook testified that Veronika called her in 2014, asking if she had time to perform a wedding for an individual named "Jennifer," which was later canceled.

Jerry argues that the magistrate court disregarded Keil's testimony and erred in doing so because this Court held in *Wood v. Hoglund*, 131 Idaho 700, 703, 963 P.2d 383, 386 (1998) that a trier of fact must accept uncontradicted testimony of a credible witness unless that testimony is inherently improbable or impeached. Jerry reads *Wood* out of context. *Wood* was an easement case wherein we reversed the lower court's finding that the Woods's use of a certain route over their neighbor's property was permissive. *Id.* We reversed the lower court because there was no

evidence contradicting or disputing the Woods's testimony that their use was adverse, and there was no finding by the lower court that the Woods's testimony was not credible. *Id*. We explained that "[a] trier of fact may not arbitrarily disregard credible and unimpeached testimony of a witness." *Id*. "[U]nless a witness's testimony is inherently improbable, or rendered so by facts and circumstances disclosed at trial, the trier of fact must accept as true the positive, uncontradicted testimony of a credible witness." *Id.* That is not the case here. Keil's testimony was contradicted because Veronika denied it. Jerry's counsel asked her several times on cross examination whether she had an affair with Palo to which she consistently responded that she did not. It was not an abuse of discretion for the magistrate court to believe Veronika's testimony, when there was no direct evidence contradicting it. Additionally, the court did consider Keil's testimony, but ultimately concluded that the evidence did not clearly and conclusively prove that Veronika had sexual intercourse with another individual during the marriage. The district court similarly went through all the evidence that was provided during trial, holding that the magistrate court did not err in granting the divorce on the grounds of irreconcilable differences because clear and conclusive evidence of adultery did not exist. Accordingly, we will not disturb the district court's conclusion that the magistrate court did not arbitrarily disregard Keil's testimony.

Moreover, it is generally understood that "where dual or multiple grounds for divorce exist, the trial court can use a sound discretion to select the grounds upon which the judge will grant the divorce." 27A C.J.S. *Divorce* § 24. Veronika and Jerry both asked the magistrate court to grant the divorce in the alternative on the grounds of irreconcilable differences. During trial, Jerry testified that he noticed the marriage was in trouble just a couple years into it, and that by 2008 they were sleeping in separate bedrooms. According to Jerry, his and Veronika's marriage "was a marriage in name, of course, but it wasn't a marr[iage] – I mean, there was no partnership. There was no intimacy. There was no having a future together."

Thus, although it was clear that the marriage started to fall apart just a few years into it, clear and conclusive evidence of adultery did not exist. Therefore, the magistrate court did not err in its finding that neither party met their burden of proving fault grounds for divorce. Accordingly, we affirm the district court on this issue.

### F. Temporary spousal maintenance.

Jerry contends that the district court erred in affirming the magistrate court's award of spousal maintenance because the magistrate court failed to articulate its rationale for the award in

its conclusions of law. Jerry also contends that the magistrate court abused its discretion in its consideration of the factors found in Idaho Code section 32-705(2). Veronika contends that the record supports the magistrate court's award of spousal maintenance as to the initial award, the amount, and the duration.

Spousal maintenance awards are governed by section 32-705, which provides:

1. Where a divorce is decreed, the court may grant a maintenance order if it finds that the spouse seeking maintenance:

(a) Lacks sufficient property to provide for his or her reasonable needs; and

(b) Is unable to support himself or herself through employment.

2. The maintenance order shall be in such amounts and for such periods of time that the court deems just, after considering all relevant factors which may include:

(a) The financial resources of the spouse seeking maintenance, including the marital property apportioned to said spouse, and said spouse's ability to meet his or her needs independently;

(b) The time necessary to acquire sufficient education and training to enable the spouse seeking maintenance to find employment;

(c) The duration of the marriage;

(d) The age and the physical and emotional condition of the spouse seeking maintenance;

(e) The ability of the spouse from whom maintenance is sought to meet his or her needs while meeting those of the spouse seeking maintenance;

(f) The tax consequences to each spouse;

(g) The fault of either party.

"Whether to award spousal maintenance under [I.C. § 32-705] is discretionary and requires the court to give due consideration to each party's financial needs and abilities." *Pelayo*, 154 Idaho at 861, 303 P.3d at 221 (quoting *Stewart*, 143 Idaho at 679, 152 P.3d at 550). An award of spousal maintenance must "be supported by substantial and competent evidence." *Stewart*, 143 Idaho at 680, 152 P.3d at 551.

Here, after considering section 32-705 in its entirety, the magistrate court granted Veronika a temporary spousal maintenance award as follows:

Until the community property is divided, Veronika should receive an award of $2,000 per month beginning November 1, 2015. Once the community property is divided, Veronika should receive an award of $750 per month for two years beginning November 1, 2015. In the event she remarries, this amount should terminate as of the date of such remarriage. At such time as the community property is divided, the $1250 per month awarded in excess of the final spousal

35

support award, should be reimbursed to Jerry as a lump sum from the second largest investment account before the balance is divided equally between the parties.

The record establishes that the magistrate court articulated its rationale for the spousal maintenance award both in its findings of fact and conclusions of law. The court found that Veronika was eligible for a maintenance order because, until the parties divided the community property as ordered in the divorce decree, Veronika would lack sufficient property for her reasonable needs, and most of the property Veronika would receive after the division she would need to support herself once she reached the age of sixty-five. The court also found that, due to her limited job skills, employability, and meager income, Veronika would be unable to support herself. Veronika was working part-time (approximately ten hours a week) at minimum wage and would need time to gain skills or an education. Thus, we hold that the magistrate court sufficiently articulated its rationale for the maintenance award in its decision.

However, we agree, as Jerry has argued on appeal, that the magistrate court's rationale was based, at least in part, on the improper consideration of Veronika's retirement needs. As noted, the court's rationale included a reference to Veronika's retirement needs. There is nothing in section 32-705 that permits a trial court to consider a spouse's retirement needs when deciding whether to award maintenance. Nevertheless, we hold that it was harmless error for the court to do so here because the remaining portions of the court's rationale, *i.e.*, the lack of sufficient property and inability to support herself through employment, was sufficient in itself to grant a temporary maintenance order.

Jerry also contends that the magistrate court abused its discretion in its consideration of the section 32-705(2) factors. First, Jerry argues that Veronika has the "[f]inancial resources and abilities" to provide for herself, $1,198,568 to be exact. However, Jerry's calculation is misstated. For example, included in the calculation is $120,000 cash Veronika allegedly took to Prague ($10,000 each year for twelve years). However, the court acknowledged that no evidence was presented showing how the money had been used, *i.e.*, was it placed in savings or spent on the community. Also included in the calculation is $340,500 for the Prague apartment. However, the court did not assign a value to the apartment and instead stated that the apartment was to be sold and the proceeds divided between the parties. Jerry also included $280,324 in retirement accounts and $100,000 in his life insurance policy, both of which Veronika will likely not realize for years to come.

Second, Jerry argues that Veronika does not need any time for "education or training" because she had no plans to go to school. As Veronika argued on appeal, although that may have been the case during the marriage, that should not preclude her from having the opportunity to do so now. Moreover, Veronika could use the time to gain additional skills so she can obtain a full-time job, which Jerry testified Veronika had planned to do during the marriage.

Third, Jerry argues that he does not have the "ability to pay" spousal maintenance due to his own expenses. Jerry provided the court with an exhibit showing his monthly income and expenses. Based on this information, Jerry alleged that he had an income of $8,500 a month from Straight Line alone, and $10,159 in monthly expenses. The magistrate court went through Jerry's list of expenses, finding that only $6,015.80 were essential, thereby leaving Jerry with approximately $2,484.20 in discretionary funds.

Finally, Jerry argues that the magistrate court applied the improper clear and conclusive standard when considering the "fault of either party" factor. Marital fault, which includes adultery, is one of the many factors that section 32-705(2) allows a trial court to consider when making an award for spousal maintenance. *See Pelayo*, 154 Idaho at 861–62, 303 P.3d at 220–21. The " 'very clear and conclusive' standard is only warranted when proving adultery as the *grounds* for divorce, not for showing 'fault' under I.C. § 32-705." *Id.* at 861, 303 P.3d at 220 (emphasis added). Under the "fault of either party" factor, the court held that, "[a]s set out above, the court did not find fault in granting a divorce herein, and the divorce should be granted on grounds of irreconcilable differences." By so holding, it appears that the magistrate court likely used the higher "clear and conclusive" standard when considering fault. The district court affirmed the magistrate court without addressing the issue. It is likely that the magistrate court addressed the fault factor as it did in order to respond to Jerry's written closing argument wherein he argued under the spousal maintenance section that, "as noted above, the court should grant Jerry a divorce from Veronika on grounds of adultery." On intermediate appeal, Jerry argued the same thing: "As noted above, the Magistrate erred by failing to grant Jerry a divorce from Veronika on grounds of adultery." Thus, Jerry himself asked the magistrate court to use the higher standard. It is unseemly for Jerry to now argue that the lower courts erred when Jerry invited the error. *See Davison v. Debest Plumbing, Inc.*, 163 Idaho 571, 575, 416 P.3d 943, 947 (2018) ("The doctrine of invited error applies to estop a party from asserting an error when his own conduct induces the commission of the error." (quoting *Thomson v. Olsen*, 147 Idaho 99,

106, 205 P.3d 1235, 1242 (2009))). Accordingly, we will not consider Jerry's argument for the first time on appeal. *See Kraly*, 147 Idaho at 304, 208 P.3d at 286. Therefore, we hold that the district court did not err in affirming the magistrate court's award of spousal maintenance. Accordingly, we affirm the district court on this issue.

### G. Attorney fees and costs below.[9]

Jerry contends that the magistrate court abused its discretion when awarding Veronika attorney fees and costs because it did not include an independent analysis of the Idaho Code section 32-705(2) statutory factors in its Memorandum Decision Re: Attorney's Fees and because it relied on its own knowledge and experience in considering the factors set out in Rule 908 of the Idaho Rules of Family Law Procedure.

As to Jerry's first contention, Veronika argues that the magistrate court did not abuse its discretion by not independently considering the section 32-705(2) factors in its Memorandum Decision Re: Attorney's Fees because it considered the factors in its Memorandum Decision when deciding whether to award spousal maintenance, which is sufficient.

Idaho Code section 32-704 provides in part:

> The court may from time to time after *considering the financial resources of both parties and the factors set forth in section 32-705, Idaho Code*, order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this act and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name.

I.C. § 32-704(3) (emphasis added). "Section 32-705 sets forth a number of factors which the court must consider in determining whether to order a party to pay the costs and fees of the other party in a domestic relations matter." *Pelayo*, 154 Idaho at 865, 303 P.3d at 224 (quoting *Noble v. Fisher*, 126 Idaho 885, 891, 894 P.2d 118, 124 (1995)). "[T]he trial court need only consider the factors set forth in I.C. § 32-705 in considering whether to award costs and attorney's fees to a party in a divorce action." *Reed*, 157 Idaho at 719, 339 P.3d at 1123 (quoting *Jones v. Jones*, 117 Idaho 621, 790 P.2d 914 (1990)). "Unless the court's decision cites the legislative factors and demonstrates that such factors were considered, the award of attorney fees is subject to being reversed and remanded." *Pelayo*, 154 Idaho at 865, 303 P.3d at 224 (quoting *Jensen v. Jensen*,

---

[9] In this appeal, we only discuss attorney fees, not costs, because the district court vacated and remanded the magistrate court's award of discretionary costs on intermediate appeal.

128 Idaho 600, 606, 917 P.2d 757, 763 (1996)). "[T]he decision to award attorney fees pursuant to Idaho Code section 32-704 is reviewed under an abuse of discretion standard." *Reed*, 157 Idaho at 720, 339 P.3d at 1124.

Here, the magistrate court recited the section 32-705(2) factors in its Memorandum Decision Re: Attorney's Fees and explained that "[a]n analysis of the above factors was performed by this court in its Memorandum Decision, for the purpose of determining whether spousal support was appropriate." Therefore, "[t]hat analysis will not be repeated here, [because] no substantially different fact situation has been demonstrated." Relying on its analysis in the Memorandum Decision, the court held that Veronika was entitled to attorney fees pursuant to sections 32-704 and 32-705. The district court agreed, explaining that it "can see no necessity for the magistrate to run through each of the factors again to determine whether Veronika should be awarded fees under Idaho Code § 32-704." We hold that, although the magistrate court did not analyze the section 32-705(2) factors in its discussion of attorney fees, the court did so when it considered an award of spousal maintenance, which is sufficient.

As explained above, the court merely has to "demonstrate[] that such factors were considered." *Jensen*, 128 Idaho at 606, 917 P.2d at 763. In *Hoskinson*, the trial court combined its discussion of the wife's request for spousal maintenance with its discussion of the wife's request for attorney fees and costs. 139 Idaho at 465, 80 P.3d at 1066. After doing so, the court denied the wife's request for maintenance and determined that each party should bear his or her own attorney fees. *Id.* We affirmed the trial court and held that "[t]he magistrate's decision to deny [the wife's] request for continuing separate maintenance was supported by substantial competent evidence. It follows that the same evidence is sufficient to support the denial of her request for attorney fees and costs." *Id.* at 466, 80 P.3d at 1067. Therefore, we hold that it was sufficient for the magistrate court to only discuss the section 32-705(2) factors in its Memorandum Decision when deciding spousal maintenance because the facts surrounding both awards were substantially the same.

That being said, Jerry argues, as he did on the issue of spousal maintenance, that the magistrate court applied the improper clear and conclusive evidence standard when considering the "fault of either party" factor. However, this time, unlike on the issue of spousal maintenance, Jerry raised the issue below. In his objection to Veronika's request for attorney fees, Jerry argued that, "[e]ven though the Court did not find that either party had met their burden of proof

regarding fault based grounds for divorce, the Court may nevertheless consider the evidence of Veronika's adultery in the context of her request for fees. *Pelayo v. Pelayo*, 154 Idaho 855, 860, 303 P.3d 214, 219 (2013)." Jerry also raised his concern to the district court. Despite Jerry's request that the lower courts consider marital fault under the lower standard, it appears the magistrate court considered marital fault under the higher clear and conclusive standard. After Jerry asked the magistrate court to consider marital fault in the context of attorney fees, the court merely referred the parties back to its analysis of the factor in its award of spousal maintenance, which provided that "the court did not find fault in granting a divorce herein, and the divorce should be granted on grounds of irreconcilable differences." Therefore, because the magistrate court likely considered marital fault under the incorrect standard, the district court erred in affirming the magistrate court without addressing the issue.

Jerry also contends that the magistrate court abused its discretion in determining the amount of attorney fees and costs to be awarded because its consideration of the Rule 908 factors was "based purportedly entirely on [its] own knowledge." Veronika contends that extensive evidence was not necessary in this case because "a significant portion of services was rendered in the presence of the Magistrate, work performed was reflected in the files of the court, Veronika's counsel submitted clear and detailed documentation, . . . and the Magistrate was well qualified by her own knowledge and experience to make a determination on reasonableness."

"In any civil action the court may award reasonable attorney fees, including paralegal fees, to the prevailing party or parties as defined in Rule 901.B, when provided for by any statute or contract." I.R.F.L.P. 908(A).[10] If a court grants attorney fees, then it must, at a minimum, consider the following factors in determining the amount of such fees:

1. the time and labor required;

2. the novelty and difficulty of the questions;

3. the skill requisite to perform the legal service properly and the experience and ability of the attorney in the particular field of law;

4. the prevailing charges for like work;

5. the time limitations imposed by the client or the circumstances of the case;

6. the amount involved and the results obtained;

7. the undesirability of the case;

8. the nature and length of the professional relationship with the client;

---

[10] Rule 908 parallels the language in Idaho Rule of Civil Procedure 54(e).

9. awards in similar cases;

10. the reasonable cost of automated legal research (Computer Assisted Legal Research), if the court finds it was reasonably necessary in preparing a party's case;

11. any other factor which the court deems appropriate in the particular case.

I.R.F.L.P 908(B).

"Before a court may determine whether claimed attorney fees are reasonable, it must have enough information to properly consider the factors of Rule 54(e)(3)." *Bailey*, 153 Idaho at 530, 284 P.3d at 974. "Some information may come from the court's own knowledge and experience, some may come from the record of the case, but some obviously can only be supplied by the attorney of the party who is requesting the fee award." *Id.* at 531, 284 P.3d at 975 (quoting *Sun Valley Potato Growers, Inc. v. Texas Refinery Corp.*, 139 Idaho 761, 769, 86 P.3d 475, 483 (2004)). "[T]he calculation of a reasonable attorney fee is within the trial court's discretion." *Id.* at 529, 284 P.3d at 973.

Here, Veronika sought an award of attorney fees in the amount of $89,202.57 and costs in the amount of $9,787.94. Veronika did not refer to any of the Rule 908(B) factors in her memorandum of attorney's fees and costs, and the only information she provided was the hourly rates of the attorneys and paralegals, a billing statement explaining the types of service, the date of service, the hours billed, and the total amount charged, and the statement that "Petitioner is the prevailing party and is entitled to attorney fees and costs." In its Memorandum Decision Re: Attorney's Fees, the magistrate court recognized that it had a duty to consider the factors found in Rule 908(B). The court listed the factors and provided an explanation for each. However, besides the first factor, *i.e.*, the time and labor required, the court had to consider the factors based upon its own knowledge and experience, as it acknowledged.

Jerry cited to *Hackett v. Streeter*, 109 Idaho 261, 264, 706 P.2d 1372, 1375 (Ct. App. 1985), both before this Court and on intermediate appeal, to support his argument that the magistrate court was not presented with sufficient information to award attorney fees to Veronika. The district court distinguished this case from *Hackett* by explaining that Veronika provided detailed billing entries, which contained dated entries describing what work was done on the case on a specific day and for how long. The court held that "[s]uch detailed billing provided the magistrate court with sufficient information for the magistrate to consider the factors set forth in I.R.F.L.P. 9[08]."

In *Hackett*, the Idaho Court of Appeals affirmed the trial court's denial of attorney fees because the party seeking the fees failed to present sufficient information for the court to consider the Rule 54(e)(3) factors. *See id.* at 264, 706 P.2d at 1375. In that case, the defendant submitted an affidavit in support of his memorandum of costs, which provided the hourly charge for the attorney's services, the total number of hours expended, and the total fee. *Id.* "Essentially this was the sole basis for the award of attorney fees. Apart from the hourly rate shown, there was no evidence as to the reasonableness of the attorney fees or the nature of the legal services which made up the 137 total hours expended." *Id.* Therefore, "all the relevant factors could not have been considered by the district court as the record does not present any information concerning the amount of attorney fees beyond the hourly rate and amount of time expended by [the defendant's] counsel." *Id.* The court explained that "it is incumbent upon a party seeking attorney fees to present sufficient information for the court to consider factors as they specifically relate to the *prevailing* party or parties seeking fees." *Id.* The defendant in that case failed to do so, so the court found no error in the denial of a fee award. *Id.*

Similarly, in *Lettunich v. Lettunich*, this Court vacated an award of attorney fees because the trial court "examine[d] some [of the Rule 54(e)(3)] factors, simply declare[d] the rest unknown, and yet award[ed] the full amount of fees requested." 141 Idaho 425, 435, 111 P.3d 110, 120 (2005). We explained that the affidavit submitted by the attorney addressed only one of the factors in Rule 54(e)(3) and merely asserted that the fees were "reasonably and necessarily incurred." *Id.* "These statements, plus the billing sheets showing how much was billed, do not equip the court with enough information to arrive at a reasonable award." *Id.*

In this case, Veronika merely provided the magistrate court with billing statements. Such information was sufficient for the first factor, but the court was required to use its own knowledge to determine the remaining factors. Although a trial court may rely on its own knowledge and experience when considering the Rule 908(B) factors, as explained in *Lettunich*, billing sheets showing how much was billed "do not equip the court with enough information to arrive at a reasonable award." *See id.* Therefore, we hold that the district court erred in affirming the magistrate court's award of attorney fees because the magistrate court was not provided with sufficient information to determine a reasonable award. Accordingly, we reverse and remand this issue to the district court with instructions to reverse and remand to the magistrate court. On remand, the magistrate court should address fault under the appropriate standard and reconsider

the evidence in light of our holding that billing statements in and of themselves do not equip the court with enough information to arrive at a reasonable award.

## H. Attorney fees and costs on appeal.

Both parties request attorney fees and costs on appeal. Jerry requests attorney fees and costs pursuant to the contractual provision in the Covenant and pursuant to Idaho Code section 12-121. Veronika requests attorney fees and costs pursuant to Idaho Code sections 12-121 and 12-123, Idaho Rules of Family Law Procedure 901 and 908, and Idaho Appellate Rules 40 and 41.

Regarding Jerry's claim for attorney fees, Jerry contends he is entitled to fees and costs pursuant to the contractual provision in the Covenant, which provides, "[s]hould either party take any action to declare the Covenant or any of its terms invalid, said party shall indemnify the other for all reasonable expenses and costs, including attorneys' fees, incurred in *successfully enforcing the Covenant*." (Emphasis added). In order to pursue fees and costs under the contractual provision in the Covenant, Jerry would have had to successfully enforce the Covenant. That is not the case here, inasmuch as we affirmed the lower courts' determination that the Covenant was invalid. Therefore, Jerry is not entitled to attorney fees under the Covenant.

Jerry also seeks attorney fees pursuant to section 12-121 based on what he describes as the clearly erroneous findings of the lower courts and because any defense of this appeal is inherently unreasonable. Section 12-121 provides:

> In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation. This section shall not alter, repeal or amend any statute that otherwise provides for the award of attorney's fees. The term "party" or "parties" is defined to include any person, partnership, corporation, association, private organization, the state of Idaho or political subdivision thereof.

We hold that Jerry is not entitled to attorney fees under section 12-121 because the issues were complicated and the defense of the appeal clearly reasonable. There is little case law when it comes to valuing businesses in marital disputes. Jerry has not provided any facts as to why or how Veronika defended the appeal frivolously, unreasonably, or without foundation. It was not frivolous for her to reasonably defend the judgment she won below, even if there were some errors. Therefore, Jerry is not entitled to attorney fees under section 12-121.

Regarding Veronika's claim for attorney fees and costs, Veronika argues that she is entitled to fees pursuant to section 12-121 because Jerry's arguments are plainly fallacious and serve only to harass her and increase the time and expense in resolving this matter. Although Jerry was found to be deceptive throughout the divorce proceedings, several of his arguments on appeal were not wholly unreasonable or without foundation. In fact, he partially prevailed on appeal. Therefore, we hold that Veronika is not entitled to attorney fees under section 12-121.

Veronika also seeks attorney fees pursuant to section 12-123. We deny Veronika's request for fees under section 12-123 as well because "that statute does not apply on appeal." *Tapadeera, LLC v. Knowlton*, 153 Idaho 182, 189, 280 P.3d 685, 692 (2012); *see also Spencer v. Jameson*, 147 Idaho 497, 507, 211 P.3d 106, 116 (2009) ("[A]ttorney fees are not awardable under I.C. § 12-123 for the appellate process."). Therefore, Veronika is not entitled to attorney fees either.

As for costs, Rule 40 provides that "costs shall be allowed as a matter of course to the prevailing party unless otherwise provided by law or order of the Court." I.A.R. 40(a). We hold that neither party is entitled to costs on appeal because each party prevailed in part. *See Valient Idaho, LLC v. JV L.L.C.*, 164 Idaho 280, 294, 429 P.3d 168, 182 (2018).

## IV. CONCLUSION

The district court's decision is affirmed in part and reversed in part. We affirm the district court's ruling that the marriage settlement agreement fails for lack of consideration, but on the alternate theory that there was no consideration as between Jerry and Veronika. Likewise, we affirm the district court's rulings concerning the characterization of the sale proceeds and the business as community property, the valuations of the business, the determination that the community was entitled to reimbursement for the funds expended towards the mortgage and property taxes on Jerry's separate property home, the division of the remaining personal property, the grant of spousal maintenance, and the grounds for the divorce. However, we reverse the district court's decision on attorney fees and remand to the district court with instructions to reverse and remand to the magistrate court for further proceedings consistent with this opinion. No attorney fees or costs are awarded on appeal.

Chief Justice BURDICK, and Justices BRODY, BEVAN and STEGNER **CONCUR.**

44